## In Re HOSFORD.

(252 N. W. 843.)

(File No. 7110.   Opinion filed February 24, 1934.)

The Attorney General, for the State.
*John Sutherland*, of Pierre, for Accused.

HANLEY, Circuit Judge. Disbarment proceedings were instituted against P. A. Hosford, an attorney now licensed to practice law in the court of this state, residing at Winner, S. D., upon complaint of the Tripp County Bar Association. That proceeding resulted in a judgment and order of this court suspending the right and license of the accused to engage in the practice of law in this state for the period of one year. Such order was entered December 13, 1932, and personally served on accused December 14, 1932. Decision appears in Re Hosford, 60 S. D. 625, 245 N. W. 822.

The instant proceeding arises upon an alleged violation of the suspension order on the part of the accused, in that he was indulging in the practice of law during the suspension period.

Complaint was made to this court by members of the Tripp county bar that violation of the order existed, whereupon the Attorney General was by this court directed to make investigation of the charges and report his finding, all of which was done. Upon analysis of such report this court issued its order to show cause to the accused why he should not be disbarred, and formal complaint was made by the Attorney General, all in accordance with Code, §§ 5274 to 5276, inclusive.

Answer was made by accused, and on November 8, 1933, a trial upon the issues thus raised was ordered before Hon. Glenn W. Martens, referee appointed to hear the case. The trial was conducted by the referee at Winner, S. D., and his report subsequently filed in this court December 14, 1933. The matter was thereupon presented before this court orally and upon briefs December 29, 1933; the accused appearing in person and by counsel.

In the original disbarment proceeding the complaint alleged three independent counts of subornation of perjury arising in unrelated criminal actions; a group of charges of improper solicitation of business; two charges of improper solicitation of litigation in charge of other attorneys; unethical and unprofessional conduct in procuring withdrawal of bail sureties and otherwise in a criminal case; a charge of misappropriation or improper handling of funds in a minor's estate; a charge of improper interference in the settlement of a judgment; and a charge of making improper or excessive fee claim.

In the instant proceeding accused is charged as follows:

First, with permitting his office in Winner, S. D., to remain open and fully equipped as a law office just as it was prior to his suspension, and being present therein himself for a substantial period of time substantially every day, and employing the services of a stenographer in said office. Permitting large gold leaf signs reading "P. A. Hosford, Lawyer," and "Lawyer, P. A. Hosford," to remain on the window and door of his office, respectively, without effort to conceal them. Failing to do anything to change the publicly apparent character of the law office as his law office, open for law practice business as usual and as it was prior to accused's suspension. Generally engaging in consultation in his office and elsewhere with clients and prospective clients on law matters, and the doing of things in his law office and elsewhere incident to the practice of law.

Secondly, with drafting or dictating legal documents used in court and/or in legal matters.

Thirdly, with participation in improper solicitation of legal business.

Fourthly, with sixteen specific instances of law practice.

With reference to this last group of charges, twelve were impliedly abandoned, upon failure of evidence to support them, and four only urged by the Attorney General. These four are denominated and will be hereafter referred to as the Backeberg, the Jirikovec, the Schmidt, and the Fennel matters.

In the original proceeding the referee, Hon. Philo Hall, found that the evidence supported one of the charges of subornation of perjury and one of the charges of improper solicitation of litigation in charge of another attorney. These findings were adopted by this court. See In Re Hosford, 60 S. D. 625, 245 N. W. 822.

In the instant case a great deal of testimony was taken and many exhibits introduced before the referee. The accused and Mr. Buffington and members of the Hosford office personnel testified at length.

The referee found in part as to the first of the charges, viz., general practice, as follows:

## "Finding II.

"That for many years prior to his suspension the accused was engaged in the general practice of law at Winner, South Dakota, where he had an established office on the ground floor fronting on one of the important business streets of the City of Winner; that after the order of suspension was served upon the accused he continued almost daily to occupy his law office during all of the period that he was under suspension until the trial of this proceeding before the Referee; that he permitted two large gold leaf signs of prominent and conspicuous nature to remain upon and across the front window of said office and the front of the door of said office, without making any attempt to remove, obliterate or to cover or conceal the signs which advertised the occupant of the building as 'P. A. Hosford, Lawyer,' and 'Lawyer, P. A. Hosford,' and without in any way altering the appearance of his office except that he did remove therefrom two hanging signs which had previously extended from the front of said building out over the sidewalk, and that during all of the period of his suspension he permitted his said office to remain open to the general public where his former clients and other citizens seeking legal advice or the assistance of a lawyer were invited to enter and where upon entering they were met by the accused who discussed their affairs with them, advised them of their rights and provided them with legal assistance and a lawyer in the person of George A. Buffington with whom he had some working agreement. The law books and fixtures of the law office remained in the building in substantially the same condition and subject to the same usages as before the suspension, and the personnel of this office, consisting of the accused and either his daughter or his sister-in-law, as stenographers, continued throughout the period of suspension the same as it had been before, except as in the next finding set forth.

## "III.

"During the time his disbarment proceeding was pending and on or about February 26, 1931, the accused and one George A. Buffington, who was and had been a practicing lawyer at Dallas, South Dakota, entered into some sort of an agreement to engage in the practice of law as partners, the exact nature of this agreement or the extent to which the agreement was carried out not

having been disclosed by either of said parties at the hearing, except that on certain occasions Mr. Buffington joined the name of the accused with his own name upon process and pleadings, and the said accused on occasions did likewise with Mr. Buffington's name; and that this relation between Mr. Buffington and the accused continued at least until December 14, 1932, when the order of the court was served upon the accused, (there being no proof of its termination then) and upon that date the accused claims he entered into an agreement with Mr. Buffington whereby Mr. Buffington rented, and Mr. Hosford sub-let to him, the Hosford law office together with all of the law books, furniture, equipment and the use of his stenographer,—Hosford's daughter,—for an agreed consideration of $50 per month to be paid by Mr. Buffington, and thereupon Mr. Buffington caused to be inserted in the window and in the door of said office a white card with his name printed thereon and the word 'Lawyer,' and ordinarily on at least three occasions each week he came to Winner to the office so leased, to meet his clients and to look after such legal business as came to him, many of whom were former clients of Hosford's who had gone to Hosford's office to consult or employ him and had been by Hosford advised to employ Buffington. That the accused showed an active, personal interest and concern relative to these clients. He discussed with them their legal rights and advised with them; that he was on occasions present and took part in conversations relative to matters of law with these clients and Mr. Buffington; that he went with Mr. Buffington to the homes of some of these clients and assisted Mr. Buffington in the transaction of legal business with the clients; that in one instance at least, he supplied his wife to execute a bond as surety in an estate matter which came to the Hosford office, and which Mr. Buffington was probating."

In regard to the Fennel matter, the referee found that it had to do with a case instituted by accused prior to his suspension, which was pressing to a determinative conclusion within the month following the suspension; that upon suspension the matter was ostensibly turned over to Mr. Buffington; that "thereafter, the said Hosford continued to consult or advise with Mrs. Fennel as her attorney and to handle said matter personally in every respect, except that when it was necessary to go to Rapid City to close the

matter, Mr. Buffington made that trip and closed the matter"; that thereafter Mr. Buffington sought to collect an additional commission fee for the work, despite the existence of a fee contract made at the inception of the litigation; and that accused went to Mrs. Fennel's home with Mr. Buffington "and insisted upon the payment of such commission."

In regard to the Schmidt transaction, the referee found that Schmidt, a former client of Hosford's, subsequently to suspension of accused, called upon accused relative to a suit against Schmidt, Jr., to set aside a contract; that accused told him that because of his (accused's) defective eyesight it was necessary to associate Mr. Buffington in the case and that he should return; that soon thereafter Schmidt called while Mr. Buffington was there, and "Mr. Hosford explained to Buffington the nature of the case, assisted in arrangements relative to fee, agreed to look after the matter for Mr. Schmidt with Mr. Buffington's assistance, and Adam Schmidt thereon executed a note for $150.00 payable to George A. Buffington which was thereafter indorsed by George A. Buffington without recourse and delivered to P. A. Hosford"; that accused testified this was to apply on Mr. Buffngton's office rent and that such payment paid rent for some period in advance; that suit was instituted but later settled by parties independently of counsel; that Schmidt sought settlement of the note with Mr. Hosford, who referred him to Mr. Buffington, who in turn referred him back to Mr. Hosford; that subsequently to the Attorney General's preliminary investigation, at which Schmidt testified, accused without interviewing Schmidt "prepared an affidavit, went to a brother of Adam Schmidt, Sr., named Jacob Schmidt, and in company with Jacob Schmidt went to the home of Adam Schmidt, Sr., where he attempted to procure the said Schmidt Sr. to execute the affidavit which accused stated was in substance an affidavit to the effect that Mr. Hosford never took the case and that Adam Schmidt, Sr., had hired Buffington. On that occasion the said Hosford agreed to return to Adam Schmidt, Sr., the $150.00 note if he would execute the affidavit, but that said Adam Schmidt, Sr., refused to execute the same."

Relative to the Backeberg and Jirikovec matters, the referee found marked variance in the testimony of each of these men as given at the preliminary investigation and as given at the trial.

Each had originally testified to consulting accused in a legal matter, viz., a claim against a closed bank, and each subsequently testified that their legal consultations occurred with Mr. Buffington. Confronted with this situation, the referee found, "In view of the unsatisfactory nature of the proof in connection with the Backeberg and Jirikovec charges, the possibility of honest mistake by witnesses not advised of the issues involved and the lack of opportunity for cross-examination at the Attorney General's investigation, the Referee finds these two charges unsupported by the evidence."

Upon the charges of improper participation in solicitation of business, and the participation in the drafting of legal papers, the referee made no specific finding, but reported the testimony, exhibits, and objections relative thereto.

The referee made a summary finding and conclusion as follows:

## "Finding VII.

"Your Referee finds that the said Hosford during the period of his suspension has been guilty of wilful disobedience and violation of the orders of the Court suspending him from the practice of law, in that since the said order of suspension he has contumaciously maintained his former law office at Winner, where he engaged in the general practice of law, counselled with clients who have consulted him, and that he has given advice and directions to such clients in regard to their legal rights on legal matters and the Referee further finds that as a part of a scheme or device of accused to practice law in disregard of the Court's order he procured George A. Buffington to associate himself with the accused for the purpose of permitting the accused to hold his clientele and law business and continue the practice of law through resorting to the use of such subterfuge, although in the course of said practice of the law the said accused at all times diligently refrained from personally appearing as an attorney in any of the courts of the state."

## "Conclusion of Law.

"That for the wilful violation and disobedience of the Court's order suspending him from the practice of law, the accused should be by the Supreme Court disbarred from the further practice of

law, or otherwise punished, as in the judgment of the Court it deems proper."

Certain fundamental legal principles govern the consideration and disposition of a matter of this character.

■ First, the so-called "right to practice law" is in fact not a vested or absolute "right," nor is it a property right, but rather it is a permit, license, franchise, or privilege granted upon demonstration of satisfactory moral fitness and satisfactory legal and general learning. To continue in the enjoyment of this privilege one must maintain his fitness and qualifications.

■ Secondly, the purpose of disbarment or other disciplinary action toward an attorney is not to punish him, but is for the purpose of guarding the administration of justice and protecting the courts, the profession, and the public.

Authorities demonstrating these principles have been carefully collated, and the subject has been ably and clearly analyzed by Judge Campbell in the decision in Re Egan, 52 S. D. 394, 218 N. W. 1. This jurisdiction, and we believe all others, are now thoroughly committed to this doctrine.

A third principle deserves consideration in the instant case.

■ In this proceeding disbarment is sought, based primarily upon alleged violation of the suspension order. While it has not been seriously urged that this court is without authority to consider the record beyond that of the alleged violation of the order, it has been suggested that the court should confine itself solely to the record in the instant proceeding without reference to the original proceeding or other matters which might be deemed pertinent on the question of disbarment.

Code, § 5271, defines certain grounds for disbarment. Subdivision 2 thereof defines one of those grounds as follows: "When he is guilty of a wilful disobedience or violation of the order of the court, requiring him to do or forbear an act connected with or in the course of his profession."

It is apparent that, if willful violation in fact exists in this matter, it is in itself sufficient basis upon which to predicate disbarment.

However, since we have carefully considered not only the record in the original case, but the whole record of accused in so far

as it has become available to us, and with a view to setting at rest the implied question raised in this case, we prefer to view the subject from a more comprehensive standpoint.

Code, §§ 5253 to 5361, inclusive, provide for the procedure relative to admission to the bar in this state. Sections 5271 to 5282-B, Comp. Laws, provide for disbarment and suspension. It will be observed from the first group of statutes that no person shall be permitted to practice law in this state until licensed by the Supreme Court. Code, § 5273, is as follows: *"Sole Power to Disbar or Suspend.* The supreme court shall have sole power to strike from the roll the name of any attorney and counselor at law, and to revoke his license or to suspend him from the practice for such time as shall seem just for cause shown."

Text statements of the law governing the situation are found in 6 C. J. 571, as follows: "As attorneys are officers of the court, the power to admit applicants to practice law is judicial and not legislative, and is vested in the courts only. This power to admit attorneys is not an arbitrary and despotic one, to be exercised at the pleasure of the court, or from passion, prejudice, or personal hostility; but it is the duty of the court to exercise and regulate it by a sound and just judicial discretion."

And again at 6 C. J. § 37, p. 580: "It is well settled that a court authorized to admit an attorney has inherent jurisdiction to suspend or disbar him for sufficient cause, and that such jurisdiction does not necessarily depend on any express constitutional provision or statutory enactment. Not only has it this power, but whenever a proper case is made out it is its duty to exercise it. This inherent power of the courts cannot be defeated by the legislative or executive departments, although statutes may regulate its exercise. The proceeding is not for the purpose of punishment of the attorney, but for the purpose of preserving the courts of justice from the official ministration of persons unfit to practice in them. The action of the court in the exercise of this power is judicial in its character, and the real question for determination in such proceedings is whether or not the attorney is a fit person to be longer allowed the privileges of being an attorney. The power is not an arbitrary and despotic one to be exercised at the pleasure of the court or because of passion, prejudice, or personal hostility; it is rather one to be used with moderation and caution,

in the exercise of a sound judicial discretion, and only for the most weighty reasons, and upon clear legal proof."

Years ago, having occasion to discuss this question, Chief Justice Marshall in Re Burr, 9 Wheat. 529, 530, 6 L. Ed. 152, said: "On one hand, the profession of an attorney is of great importance to an individual, and the prosperity of his whole life may depend on its exercise. The right to exercise it ought not to be lightly or capriciously taken from him. On the other, it is extremely desirable that the respectability of the bar should be maintained, and that its harmony with the bench should be preserved. For these objects, some controlling power, some discretion, ought to reside in the court. This discretion ought to be exercised with great moderation and judgment; but it must be exercised; and no other tribunal can decide, in a case of removal from the bar, with the same means of information as the court itself."

■ This court is definitely committed to the doctrine that it may acquire, through all legitimate channels open to it, such information as may be available to it touching the present moral fitness of the accused to practice law. In re Morrison, 45 S. D. 123, 186 N. W. 556; In re Egan, 52 S. D. 394, 218 N. W. 1.

■ It is a principle so fundamentally basic as to need no amplification or extended citation of authority that the primary question before the court in a matter of this nature is the question of an attorney's then present moral fitness to be intrusted with the duties, responsibilities, and privileges incident to his engagement in the practice of law. This has been a controlling doctrine in every matter of this kind before this court and has been extensively discussed in many of its decisions. Particular attention is called to In re Egan, 36 S. D. 228, 154 N. W. 521; In re Egan, 37 S. D. 159, 157 N. W. 310; In re Egan, 52 S. D. 394, 218 N. W. 1; and In Re Hosford, 60 S. D. 625, 245 N. W. 822.

■ A proceeding in disbarment necessarily invokes the sound judicial discretion of the court. Such a proceeding may, and frequently does, terminate not only by order of disbarment or dismissal, but by subjection of the accused to some lesser disciplinary action, as suspension, reprimand, or requirement of apology.

To adequately and fairly determine any given case, and to properly discharge its admitted function, both as to the individual charged and to the public, the court should have all of the reliable

information available to it through legitimate channels, and should carefully consider all of · such information in conjunction with all of the circumstances of the situation.

█ Further, to effectuate the purposes sought to be sub- · served by admission regulations, and to maintain continuous protection of justice administration and of the public against the maladministrations of the unscrupulous lawyer, it is of imperative necessity that the court should act at any time to bring into exercise its disclipinary power, either upon complaint made or upon its own motion, when sufficient occasion arises.

█ Bearing in mind the oftentimes catastrophic consequences of disbarment for the individual involved, and the fact that no review may be had, except by the same tribunal, of the exercise of this very great power, and that the disbarred attorney is without recourse save to make application for reinstatement—which, incidentally, he may always do—it follows, of course, that the power should be exercised most cautiously and with scrupulous protection of the rights of the accused. He is always entitled to full hearing on the matters being considered by the court and to urge any facts or matters in explanation or extenuation of charges made or substantiated. He is not entitled to control what portions of his record may be analyzed by the court, nor may he successfully urge that the court is without power or jurisdiction to investigate by proper means any fact or circumstance concerning his record and character that will assist the court in accurately determining his then fitness to practice law. Such judgment as the court may enter in a disbarment action is not res adjudicata if, thereafter, upon proper hearing, with the right of accused safeguarded, the court shall determine otherwise as to the then fitness of such accused to practice, or to the propriety of the order previously entered.

█ It obviously follows that an act by a suspended or disciplined attorney, not of itself deemed sufficient to invoke the disbarment power, might give rise to modification of the judgment drastically, on complaint or on the court's own motion. Likewise the conduct of accused or the development of additional facts might give rise to modification of a suspension order, either favorably or unfavorably to accused.

The irresistible logic and exigencies and law behind the professional regulatory and disciplinary function of the court force us to the conclusion that there exists in the court inherent and statutory power of discipline and that it is final in the court and that it exists nowhere else; that such jurisdiction is a continuing one; that all members of the profession admitted to practice are constantly amenable to the disciplinary jurisdiction of the court; that it is not only within the power of the court but its duty to examine fully into the entire record of the accused upon any disciplinary proceeding questioning the fitness of accused to practice; that the action of the court in such a proceeding is not res adjudicata and may be modified if the court deems its original judgment erroneous, or modified from time to time as, to the court, it may seem the facts require.

██ With the legal principles involved before us we are brought to an analysis of the merits of the instant case.

A review of the evidence discloses in both the original proceeding (In Re Hosford, 60 S. D. 625, 245 N. W. 822, 823, supra) and the present one that accused has flatly denied any wrongdoing in connection with all of the charges in both cases. He admits the maintenance of the signs referred to on his windows, and states that he occupied the office for a short time on most days when the weather was not inclement for the purpose of having the stenographer (his daughter) read current law decisions to him, in view of his impaired condition of eyesight. For reasons of economy he urges that he did not destroy the signs, and avers that there was no intentional disobedience in permitting the signs to remain, and that he had not deemed it questionable. He denies absolutely that he did anything in the way of law practice.

The claimed arrangement with reference to office rental, employment of the stenographer, and the occupancy of George A. Buffington, are set forth in a quoted finding by the referee.

With reference to all other charges in both cases which have evidence to support them, there is a sharp conflict in the evidence. On some charges in each of the cases each of two different referees found against the accused and this court adopted the referee's findings in the original case. In re Hosford, supra.

The referee resolved all doubts in favor of the accused in the Backeberg and Jirikovec matters.

In the Fennel and Schmidt transactions the referee, after hearing the evidence and seeing the witnesses, resolved the facts against the accused. It was found that there was effort on the part of accused to have Schmidt change his testimony after having once testified under oath. Under this finding something more than mere implication of attempted subornation of perjury intrudes itself. It will be remembered that subornation of perjury was found in the original action.

It is extremely difficult for us to see how accused could continue almost daily presence in his office, which remained substantially as it had always appeared, and avoid almost daily importunities from both old and new clients for legal advice. Accused had practiced law since 1908 in the general vicinity of Winner, and for many years at Winner. His office was prominently and conveniently located, and in its continued appearance and manner of maintenance constituted a constant invitation to the public to repair to it for legal counsel. Accused is 56 years old; is prominently known; is a lawyer of ability; has been very active in practice; and has met with large measure of professional success.

Under the circumstances that existed, it is simply inevitable that applicants for legal service should go into the office. Mr. Hosford grants that they did, but that he merely sought to hold such business for Mr. Buffington, who, under the arrangement, was to be there but three days a week, although it was ostensibly Mr. Buffington's office only, under accused's claim, albeit it was open daily with accused ordinarily there with his daughter, the stenographer.

The Hosford-Buffington claimed arrangement itself, and the relation of Mr. Buffington to the situation during the suspension period, may be most charitably characterized as being highly anomalous.

Accused is a man given to vigorous and independent action, energetic in his profession, believing fully and justifiably in his own professional competence, and intolerant of interference in his affairs. We believe the persistent tenacity of accused, as well as a typical example of his methods of practice, are demonstrated by the facts in both the Fennel and Schmidt transactions.

We are unable to conceive how the structure could exist that did exist, with a lawyer of accused's temperament the central

figure in it, without practically compelling his engagement in law practice. We agree with referee's view concerning it.

Reputable lawyers of unquestioned integrity, whom we feel certain are cautious and reluctant in the matter of making accusations in a matter of this seriousness, and who have had years of experience in the practice in the same vicinity and courts as the accused, have testified that in their opinion accused was the author of certain legal papers used in actions during the suspension period in which Mr. Buffington was interested.

Lawyers of experience recognize that an active practitioner, over the years, frequently, if not always, develops a peculiarity of style and distinctiveness of diction and expression in his authorship of legal documents which is readily recognizable by those familiar with his work.

However, this is a bit of evidence to which we should hesitate to assign material weight, if it stood alone, due to the apparent possibility of honest mistake. When as forcefully and copiously corroborated by surrounding facts and circumstances as it is here, we are of the view that it has some merit.

It is undisputed that letters improperly soliciting business, and of a character condemned by the Canons of Ethics of the American Bar Association and the State Bar Association, emanated from the Hosford office at Winner at the instance of some one. We do not deem the evidence sufficient to fix responsibility for them upon the accused. With respect to them we merely observe that they are remote from a creditable commentary on the character of the office in which they originated.

Throughout the entire record of all of these proceedings the attitude of accused has been one of aggressive militant combativeness. We recognize and approve the right of any one to fight vigorously for that which is his due and certainly to devastate a false accusation. We deplore the inability to feel, or the unwillingness to evince, any contrition on the part of an attorney against whom professional wrongdoing has been definitely established.

With the single exception of the incident of permitting his professional signs to remain on his office, for which accused expresses regret, and which standing alone might conceivably be viewed as an act in bad taste only, accused seeks either to deny or militantly justify the charges against him.

He has undertaken in his argument before this court to palliate the offense of subornation of perjury committed under circumstances that indicate it could have been inspired by the most sordid motives only.

The whole record reeks with an unhealthy miasma of blunted ethical sense in the matter of attitude, questionable methods, manner of practice, and lack of wholesome professional idealism.

There is an underlying and pervading motif and entity in the record made by the accused, and in the record of these proceedings, that constrains us to the conclusion that accused suffers so great a poverty of ethical concept as to make incomprehensible to him the high standards of conduct, integrity, honor, unselfish willingness to serve, and professional probity that should characterize a lawyer. We are without indication of his present ability to understand the necessity for those standards.

In the case of In re Morrison, 45 S. D. 123, 186 N. W. 556, 559, it was said by this court, that "Many urge that the punishment he has suffered will deter him from future wrongdoing, forgetting that it is not fear as to the consequences of wrongdoing that qualifies one for admission to the bar, but rather an innate desire and intent to follow the right course."

We regretfully conclude that in the instant case such "innate desire" is lacking.

A studious analysis of the entire evidence taken in the Attorney General's investigation and that taken on trial by the referee in this case, as well as that in the original case, has been made by the court.

We are satisfied that the findings of the referee are amply supported by the evidence and adopt them.

Accused is 56 years old. He suffers some impairment of vision, and there is some suggestion of additional physical disability. He has given the bulk of his time to the law, and we have been given to understand that he has no substantial means.

His situation is one that appeals most compellingly to natural human sympathy. We believe it to have been in a measure persuasive on the referee in the original case, and was, we think, properly considered. We said in that case: "We are convinced that the referee gave the accused the full benefit of all doubts and

that, if he erred in his findings, such error was upon the side of charity toward the accused." In re Hosford, supra.

The court also said in that case: "That deliberate subornation of perjury, which was found as a fact by the referee and which we regard as established beyond a reasonable doubt in this case, is ample to justify disbarment must be admitted. It might almost be said to require disbarment."

We now say of deliberate subornation of perjury, particularly of the sordid variety evident in this case, that there is no offense better calculated to poison the very springs of justice at their source and to wreck completely the effort of humankind to achieve justice through its tribunals.

The evil reaction of the offense is intensified when perjury is inspired and directed by an astute and skilled trial lawyer.

The judgment of suspension was not only tempered with mercy, but was founded on the sincere and sympathetic hope that it would prove adequate to subserve the purpose. We rue exceedingly the failure of that hope.

We are confronted now with a duty, unrelenting in its demands, to test the accused and his situation in the light of the whole record and by the standards outlined in the legal principles announced earlier in this decision.

Having done so, we find it plainly incumbent upon us to revoke the license of accused.

While we must do this as a court, as men, possessed of natural human sympathies, and having in mind the heavy punishment that may be incidental to disbarment, surely we may express the continuation of our sincere hope that accused may so comport himself as to alleviate his situation.

It is the judgment of this court that the accused be disbarred from the practice of law in this state and his license canceled.

CAMPBELL, WARREN, and RUDOLPH, JJ., and FISHER, Circuit Judge, concur.

HANLEY and FISHER, Circuit Judges, sitting in lieu of ROBERTS, P. J., and POLLEY, J., disqualified.