## In Re MILLER

No. 3095

July 2, 1936.                                      59 P.(2d) 9.

*A. Grant Miller,* pro se.

*Geo. A. Whiteley,* for State Bar of Nevada.

## OPINION

By the Court, TABER, J.:

Petitioner, A. Grant Miller, has instituted this proceeding for a review by this court of the action of the

board of governors of Nevada state bar finding him guilty of unprofessional conduct and recommending that his license to practice law be revoked, and that he be forever disbarred from practicing law in this state.

On June 17, 1933, Thomas McCann consulted petitioner with the idea of having the latter commence suit to foreclose a $2,500 mortgage. According to Mr. McCann, the only conversation on this occasion, aside from his directing petitioner to commence the foreclosure suit, related to the $25 payment made by him to petitioner, in currency, for which petitioner wrote out and handed Mr. McCann a receipt in the following words and figures: "Reno, Nev., June 17/33. Recd from Thos. McCann the sum of twenty-five dollars acct initial costs McCann v. Bathurst. A Grant Miller." McCann's testimony is to the effect that petitioner told him this money was for filing the suit and paying sheriff's fees and mileage for serving the papers. Petitioner admits that Mr. McCann talked to him on the aforesaid date about the foreclosure suit, but testifies that in the conversation he informed Mr. McCann that he did not think the mortgaged property was worth much, that he did not think anybody would buy it, and that McCann had better get his money out of the mortgagor if he could. To this, according to petitioner, Mr. McCann replied that he would like to get his money, but did not see any chance of doing so, and thought best to foreclose, as he thought he could "make some money out of the place if he got it." Petitioner says he explained to McCann that the latter would have to bid in the property and pay all the expenses and fees himself. Petitioner's version of the remainder of that conversation is as follows: "He wanted to know how little it would cost to start it, and I said, 'It will cost you probably around three hundred dollars altogether.' 'Well,' he said, 'I do not want to pay out the money now, but how much would it actually cost to start it?' I told him, 'About twenty-five dollars.' I said, 'Do you want to start it right away?' He said, 'If you can get any money out of her I would like to have

you get it if she can pay that interest and start it a little later.'" Petitioner testifies that the $25 payment was not for clerk's and sheriff's fee, but was simply an advance payment on petitioner's attorney's fee.

The respective versions of what happened in 1933, after June 17, will now be stated in substance, and in narrative form:

Thomas McCann: At the time I gave him (petitioner) the suit, the home loan came up. Of course, then I had to stay back for awhile, couple of months, to find out whether I would give her (mortgagor) a chance, and it went on and went on, and I went to California. I thought no use to bother. He had the papers, so I didn't have anything to say then until after I came back from California. I can't exactly approximate the time of my return—didn't pay much attention to it, but anyhow mortgagor's application had been on file with the home loan about two months. From June 17, 1933, until November 6 of that year, I made frequent demands upon him to bring the suit. On November 5, 1933, I went down to see him, and asked if he was going to file the papers. He said, "Yes, I am going right to work at them." He said the home loan had told him that mortgagor's application had not been disapproved. I told him I thought it had, because the home loan man had told me so the day before. I left him and went to see the home loan man, and he told me they could "do nothing with it." I told Miller the loan wasn't going through, and he said, "I will see about it." As I was coming from the home loan office, Miller called me from across the street, and I went across to where he was. He said that he had just been talking to one of the home loan men, and that mortgagor's application had not been disapproved. I told him that it had been disapproved, and for him to start the suit. I said, "We have fooled long enough"; then he said, "I will get right at it and will call you up when I get it through"; then I went home and talked to my wife, telling her that, from the way Miller acted, I didn't think he was going to do anything.

Next morning I went down and demanded the note and mortgage back from him. This was on November 6, 1933. He gave me the papers, and then I spoke to him about the $25 I had handed him on June 17. He said he would have to see a lawyer, and also asked me if I didn't think that what he had done for me was worth something. I told him that he hadn't done anything for me yet, outside of a lot of talking. I took the note and mortgage to Mr. Barry, who proceeded to foreclose the mortgage. Mr. Miller never has paid back that $25. Afterwards I went to see Mr. Cooke, chairman of the local administrative committee of the state bar, and made a statement of the facts regarding this $25 item. This was done with the view of having proceedings taken against Mr. Miller for professional misconduct. Nothing was said about the home loan when I first gave the papers to Mr. Miller, but it wasn't very long afterwards, a matter of days or weeks, until the home loan came into the situation. Mr. Miller did not, in any of his talks, inform me that he had been suspended by the state bar. When I gave him the $25, he was going right ahead and commence the suit. The mortgagor was one of the first persons to file an application for a home loan, and she informed me that she had filed the application, and I agreed then to wait for awhile before foreclosing. I had to wait. There was no way of getting it through— couldn't do anything. Mr. Miller told me he didn't think we could do anything; and circulars were issued, telling about it. When mortgagor informed me that she had made application for a home loan, I agreed to let the foreclosure matter ride until such time as she could get the loan. It was after the man in the home loan office told me they could not do anything with her application that I went to see Mr. Miller, and told him to proceed with the foreclosure suit. He didn't do anything about it. I think this was some time in November, and finally I went and got the note and mortgage back and took them to another attorney. On June 17 mortgagor's note was overdue about six months. I had been after her more

or less persistently, and only wènt to an attorney as the last hope. There was no other place to go.

A. Grant Miller, petitioner: After Mr. McCann agreed that I should first try to get some money out of the mortgagor before commencing suit, I wrote her a letter, and she came in and talked about the home loan proposition, saying she would pay Mr. McCann if she could get a home loan. I then saw Mr. McCann, and at first he objected, as the home loan organization had not been completed as yet in Reno. I then proceeded to get some definite information about the home loan and about the bonds the mortgage holder would be expected to take, but at first Mr. McCann refused to take the bonds and said he wanted the property sold so we could "make the money out of it." Then I said, "In that case, the only thing to do is to go ahead and foreclose." Mr. and Mrs. McCann and I drove out to see mortgagor, and, after talking with her, Mr. McCann agreed that, if she could get a home loan, it was all right, and that he would not foreclose, and so it ran along for awhile. I helped mortgagor make out her papers, went with her to the home loan office and tried to get the loan through. She reported to me that they were going to make the loan, and I so reported to Mr. McCann, but there was considerable delay trying to get the appraisers, and she had to make out some more papers and they kept telling her they were going to make the loan. So it went along for some considerable time. In the meantime, another matter came up: mortgagor had a claim against the highway department, growing out of the fact that the route of the highway had been changed in such a way as to leave her property some distance away from the new route. She had made some kind of arrangements with the department for the removal of her buildings to the newly established highway. And I think they paid her some money too, but she still had a claim against them, and told me about it. I talked to Mr. McCann about this highway matter, and he told me if I could get her to pay the three months' interest out of that highway money,

he would not foreclose, and would "let it ride for awhile longer." The three months' interest was past due, and the next three-month period was almost due. I told mortgagor what Mr. McCann had said. And then there was a dispute between her and the highway commission as to how much they would pay her. Finally they reached an agreement, and I reported that fact to Mr. McCann, and it was agreeable to him. "Then that ran along for some time and I visited the highway department up here and talked to them about it, and I advised mortgagor to accept the amount they offered to pay her, which was insufficient to even pay these two interest payments and leave her anything, and she wanted to know how long McCann would hold off on the foreclosure—she would not trust him. I said, 'I do not know. He has just told me to let it go and stave it off for awhile, and you will have that much paid on it if your home loan goes through. It will be all right.' Then she agreed to do that." Then Mr. McCann told me that he understood the home loan had been disapproved. I told him that I had no report on it. Then I went to the home loan office. They told me no order or action had been taken on it either for approval or disapproval. I then reported to Mr. McCann, and he insisted that the application for a loan had been disapproved, and that they had told him so. He went on to say that he would go down to the home loan office himself. It finally ran along for some time, and he came in demanding his papers. Nothing was said about the $25 at that time. On a later occasion he asked me about the $25. I asked him if he thought he had anything coming. He replied that he had paid me $25. I told him that he ought to pay me more than $25. He said he thought he had it coming to him. I said, "If you have something coming, all right. We will see." He said he would see a lawyer, and I said, "If the bar association thinks I should repay that $25 I will do that, but not otherwise, and that is all there is to it." I wanted to have the mortgagor as a witness and telephoned all around last night every place

and to every party that knows her, but she has moved away from the place where the mortgaged premises were, and I have not been able to find her. "I made the proposition in the letter to the committee and I got a letter back from the committee, saying in answer thereto that I pay the $25 on or before May 1, 1934, but I did not take advantage of that as I wanted a chance to tell the committee my side of it and for that reason I held it off. I did not think it was right, and I do not think it is right now to pay them the $25, because he retained me to bring the foreclosure suit, and he instructed me to get the money if I could the other way, and I went out there three times—went out twice, I think, with him, and once with him and his wife, and another time with my son to see the mortgagor, and I saw her and I guess she called me up on the telephone a dozen times, and I telephoned to her, and I took this matter up with the home loan company repeatedly and I called and visited and helped her with the papers. I also took the matter up with the highway department and worked with that, and I do not think it would be right from any point of view to pay him $25, and let him get off without paying for the lawyer's services. I will, however, say further after considerable evidence and hearing, if the board says I shall pay it, of course I will pay it." I was suspended from the practice of law in Nevada from September 18, 1933, until March 18, 1934. I figured that, if Mr. McCann insisted on going ahead with the foreclosure, I was going to turn it over to some other lawyer. The services I rendered for Mr. McCann were performed from the time he came to see me—chiefly in July and August of 1933. I was never present before the local administrative committee to give my version of this McCann matter. Mr. McCann asked me only once to return the $25. I have not returned it. In fact, I think I ought to sue him for an attorney's fee. I think the mortgagor got some money from the highway department, but I do not know what she did with it. She wanted something like $800, but, as I remember it, I

think she finally took about $300. In what I did for her, I was only helping out Mr. McCann. It was his request that I should help on the home loan, but I was not representing mortgagor as her attorney in any way. At Mr. McCann's request, I helped her out and tried to get the money for him.

On February 20, 1934, the chairman and secretary of the local administrative committee, district No. 5, filed a complaint against Mr. Miller, charging him with misconduct in office, consisting in this: That, when he was engaged by Mr. McCann to foreclose the mortgage hereinbefore mentioned, he accepted the employment with the understanding that the court was to set the attorney's fee; that at the time of his said employment he informed Mr. McCann that the costs would be $25, which sum was then and there paid, for which Mr. Miller wrote out and handed Mr. McCann a receipt, a copy of which has already been set forth herein; that from June 17, 1933, until November 6, 1933, Mr. McCann made frequent and urgent demands upon Mr. Miller to commence said foreclosure suit; that finally on November 6, 1933, Mr. McCann demanded and received from Mr. Miller the said note and mortgage, and at the same time demanded that Mr. Miller pay back the $25 which had been advanced him as costs, but that Mr. Miller refused, and ever since has failed and refused to return said cost money to Mr. McCann. On February 21, 1934, a certified copy of said complaint was served on Mr. Miller, along with a notice to answer the complaint within ten days from date of service. On March 2, 1934, Mr. Miller filed an answering statement of fact, in which he offered to repay the $25 to Mr. McCann if in the opinion of the bar committee he should do so. On April 13, 1934, the secretary of the local administrative committee advised Mr. Miller by letter that his offer to repay the $25 to Mr. McCann was acceptable, on condition that the amount be paid on or before May 1 of that year. "If this is impossible due to the fact that the whereabouts

of Mr. McCann is unknown, then you are to make payment to me as secretary of the local administrative committee, at which time the formal charges now pending against you before this committee will be dismissed." On May 17, 1934, the secretary wrote another letter to Mr. Miller, in which was inclosed a copy of the aforesaid letter of April 13. Said letter of May 17 advised Mr. Miller that the secretary had been instructed by the committee to inform him that his offer to repay the money to Mr. McCann was acceptable, and that, in view of the fact that the letter of April 13 might have gone astray, the secretary was again writing to advise him that payment of the $25 must be paid directly to the secretary at his offices on or before May 20, 1934, and that, if the money was received by that time, formal charges then pending against him would be dismissed by the committee. The money not having been paid, Mr. Miller was, on May 31, 1934, served with written notice that the hearing of the charges pending against him would be had at a designated hour and place on June 11, 1934. Mr. Miller did not appear on said last-mentioned date, nor did he communicate in any manner with the committee. The hearing was had on the date set, June 11, Mr. McCann testifying. On August 3, 1934, the local administrative committee mailed to Mr. Miller and filed with the secretary of the board of governors of the state bar of Nevada its findings of fact, conclusions of law, and recommendations, wherein Mr. Miller was adjudged guilty of unprofessional conduct, substantially as alleged in the complaint, and it was recommended that his license to practice law be revoked, and that he be forever disbarred from the practice of law in Nevada. On October 23, 1934, Mr. Miller filed with the board of governors of the state bar a statement in opposition to the report of the local administrative committee. In this statement, which was verified, he said, among other things, that "no hearing whatever has ever been had on the complaint herein before the

said local administrative committee or anywhere; that no notice of any hearing has ever been given this defendant, and this defendant therefore demands a hearing of the above entitled matter." On October 27, 1934, the secretary of the state bar notified Mr. Miller that the board of governors had considered his said statement and found it defective in two particulars, which were specified, and referred him to rule XXXII of the rules of procedure governing local administrative committees. In the same letter, the secretary notified Mr. Miller that the meeting of the board of governors held on October 26 had been recessed to November 16, 1934, "for the purpose of hearing the trial de novo or additional testimony, on condition, however, that you file a satisfactory application with the undersigned as secretary on or before November 3, 1934. If no such satisfactory application is filed by November 3, the board will on November 16 take final action in accordance with the recommendations of the local administrative committee." Mr. Miller did not file any application with the secretary on or before November 3, 1934, and on November 16 of that year the board of governors met and ordered that the recommendations of the local administrative committee be approved and adopted by the board. While said meeting was still in session, however, Mr. Miller handed the secretary an affidavit in which he reiterated that "no hearing had ever been had in the above-entitled matter before the local administrative board or council." In the same affidavit he stated that the reason why certain evidence in his behalf had not been presented to the local administrative committee was that "no hearing was ever had before said council, and affiant never had an opportunity to present it." Upon receipt of this affidavit the board of governors rescinded its action approving and adopting the recommendations of the local administrative committee, and on November 17, 1934, proceeded with a hearing de novo, at which Mr. Miller testified in full. In the course of his testimony Mr. Miller said that he could not tell the board why he did not appear before

the local administrative committee on June 11, except that he had received another notice about the same time in an entirely different proceeding, the Woods estate, and that he must have confused that notice with the local administrative committee's notice that the trial of the charges against him would be had on June 11. "I could have been here just as well as not on the 11th, I know, but I do not know why, but I was sick in bed for a week or two, but I was out at times." Referring to the two letters written him by the secretary of the board of governors, stating that his offer to pay back the $25 was accepted, and that, upon payment being made, the charges against him would be dismissed, Mr. Miller testified, in response to a question as to whether he had ever answered either of those letters, "No, I just threw them into the waste basket, I suspect." At this hearing Mr. Miller was asked the following question: "At any rate you can appreciate at least, Mr. Miller, that you misapprehended the two written notices which were sent to you and that they both were perfectly clear?" In answer to that question he testified, "Yes, I might admit that. And they might charge it up to carelessness if they want to."

At the conclusion of the said hearing on November 17, 1934, the board of governors made its findings of fact in substantial accordance with the charges made in the complaint, and in its written findings of fact, conclusion of law, and recommendation, certified to by its secretary and filed in this court November 24, 1934, went on to say:

"That from the foregoing Findings of Fact, and due to the repeated offenses on the part of accused and the numerous occasions on which he has been before the Local Administrative Committee, this Board and the Supreme Court for disciplinary action, together with the known and confessed irresponsible method of practicing law, which endangers the general public and those members who may select him as their counsel, the Board of

Governors makes the following Conclusion of Law and Recommendation:

"Conclusion of Law

"That said defendant has, in this matter, failed to foreclose a mortgage for Thomas McCann, or to return the costs of Twenty Five Dollars ($25.00) which was paid for that purpose, and that further, A. Grant Miller failed to comply with his offer as outlined in his answer on the Committee's acceptance and time given by the Committee to pay the same, and as such, is guilty of unprofessional conduct warranting his being disbarred therefor."

Then follows the recommendation of the board of governors to this court that it revoke Mr. Miller's license to practice law and forever disbar him from such practice in the State of Nevada.

In the interesting case of In re Hosford, 62 S. D. 374, 252 N. W. 843, 848, in which the accused was disbarred, the court said that "to adequately and fairly determine any given case, and to properly discharge its admitted function, both as to the individual charged and to the public, the court should have all of the reliable information available to it through legitimate channels, and should carefully consider all of such information in conjunction with all of the circumstances of the situation."

In the instant case the testimony in a number of particulars is uncertain and incomplete. For example, Mr. McCann was asked: "In the complaint that is filed here it is stated that from the 17th day of June, 1933, until November 6th, 1933, you made frequent demands upon him to bring the suit. * * * That is a fact, is it? A. Yes, sir." But the record is silent as to specific times or occasions when such demands were made, with the exception that Mr. McCann did testify that, when the mortgage and note were handed to Mr. Miller on June 17, 1933, the latter was directed to commence suit to foreclose the mortgage, and further testified that on November 5, 1933, he demanded that Miller proceed immediately to file the suit. It appears that Mr. McCann

went to California, but the record is not at all satisfactory as to when he went or when he returned. We are thus, for the most part, left to infer, as best we can, when McCann made the "frequent demands" upon Miller to commence the foreclosure suit. Again, the record is uncertain and unsatisfactory as to when the home loan office learned that mortgagor's application for a loan would not be granted. No one from the home loan organization was called to testify regarding this matter. For some reason, not disclosed by the record, Mr. McCann was not recalled to testify regarding a considerable number of matters testified to by Mr. Miller, with the result that the latter's testimony in a number of particulars remains uncontradicted.

■ In our opinion, the conclusion reached by the local administrative committee and the board of governors, that the $25 was handed Mr. Miller for the specific purpose of paying clerk's and sheriff's fees, was right. Besides Mr. McCann's positive testimony in this regard, there is Mr. Miller's receipt "acct initial costs," and the further circumstance that $25 represents approximately the amount of the clerk's fees, plus the sheriff's fees and mileage for serving the summons. On the other hand, the testimony of Mr. Miller indicates that he may have performed services for Mr. McCann which were reasonably worth $25. Petitioner would be in a better position in urging the value of his services, had he been diligent in looking after his client's business. We think the testimony, though in some respects uncertain and incomplete, is sufficient to clearly show that petitioner was negligent and careless in handling the business intrusted to him by Mr. McCann. This is to some extent confirmed by petitioner's own testimony, for, after testifying that Mr. McCann approved the idea of not foreclosing for awhile, and that he (Miller) so reported to the mortgagor, Mr. Miller went on to say that Mr. McCann told him he understood that mortgagor's application for the home loan had been disapproved. A little later according to Mr. Miller, Mr. McCann again insisted

that the application had been disapproved. Then, according to petitioner, "It finally ran along for some time and he came in demanding his papers." It will be remembered that the six-month period of Mr. Miller's suspension from the practice of law in this state under the order of this court began on September 18, 1933. If we concede, without deciding, that any services he may have performed for Mr. McCann after September 18, 1933, did not constitute "practicing law," the very fact that after the last-mentioned date he could not commence the foreclosure suit imposed a special duty upon him to diligently and definitely ascertain the status of the mortgagor's application for a home loan, and to keep in touch with Mr. McCann in order to learn how long the latter was willing to refrain from having the foreclosure suit commenced. The fact that Mr. McCann for some time before he demanded his papers back on November 6, 1933, was insisting that the mortgagor could not negotiate the home loan, gives support to his testimony that he made "frequent demands" upon Mr. Miller that the latter proceed with the foreclosure suit.

Mr. Miller's conduct in consigning to the wastebasket the two letters from the local administrative committee informing him that all charges against him would be dismissed if he would repay the $25 in indefensible. Upon receipt of the first of those letters, he should either have promptly repaid the $25 or requested a hearing. He not only did neither, but, after receiving notice that the hearing of the charges against him would take place on June 11, 1934, utterly ignored the notice and failed to take advantage of the opportunity then afforded him to give his version of the whole affair. His explanation of his conduct in this particular is unsatisfactory. Furthermore, in his statement in opposition, filed August 23, 1934, Mr. Miller stated positively that no hearing on the complaint had ever been had before the local administrative committee, and that no notice had ever been given him. In the verification to said statement, he swore that its contents were true of his own

knowledge. Again, on November 16, 1934, more than five months after the hearing of the charges against him had actually taken place, in an affidavit filed with the board of governors, he swore positively that no hearing was ever had before the local administrative committee, and that he had never had an opportunity to present his evidence. While such senseless statements, in direct contradiction of the truth, could not deceive either the local administrative committee or the board of governors, they certainly do not reflect any credit upon petitioner.

Besides defaulting at the hearing on June 11, 1934, and contemptuously throwing the secretary's letters in the wastebasket as aforesaid, petitioner also ignored the secretary's letter of October 27, 1934, and it was not until the board of governors had already taken action on November 16, 1934, recommending his disbarment that he presented the affidavit hereinbefore mentioned, whereupon the board patiently and considerately rescinded its action and proceeded to give him a hearing on the following day. At this hearing Mr. Miller told how he had tried the night before to locate the mortgagor, as he believed that her testimony would corroborate some of his. It does not appear, however, that, had he not ignored the hearing before the local administrative committee on June 11, 1934, he would not have been able to avail himself of her testimony at that time. It may also be observed here that there is no satisfactory showing that Mr. Miller made any diligent effort to persuade the mortgagor to pay over to Mr. McCann the money she received from the highway department.

It is plain that a mere reprimand or censure would not be adequate discipline, in view of the facts and circumstances disclosed by the record in this proceeding. But we have had no little difficulty in determining whether petitioner should be disbarred as recommended by the local administrative committee and the board of governors, or suspended from the practice of law. Notwithstanding we have not had the benefit of any brief,

nor the citation of any authorities whatsoever when this proceeding was orally argued, we have, because of its importance as well to the petitioner as to the state bar and the public, patiently considered a large number of cases, of which but a few will be mentioned here.

In the case of In re Bond, 168 Okl. 161, 31 P. (2d) 921, the accused attorney received from his client a cost deposit for the purpose of instituting an action in the justice's court. He failed to file the case, but falsely represented to his client that the case had been filed. When the client learned that the case had not been filed, he demanded of the attorney that he return the $5. This the attorney refused to do, unless the client would pay him $10 for services in attempting to effect a settlement. The attorney was disciplined by suspension from practice for ninety days.

In Rehart v. State Bar of California, 217 Cal. 57, 16 P. (2d) 993, the attorney was employed to probate an estate for an agreed fee of $150, $50 of which was paid immediately. After letters of administration issued, client paid the attorney $30 to cover annual premium on a surety bond, but the attorney failed to remit said premium. Later client paid the attorney the remaining $100 of his fee, but he never completed the probate of the estate or rendered any further services for her. The board of governors of the state bar recommended suspension from practice for three months, and the supreme court approved the recommendation and suspended the attorney accordingly.

In the case of Matter of Davidson, 233 App. Div. 311, 252 N. Y. S. 767, the attorney complained of had been retained to bring certain actions to collect damages for physical injuries to clients. He failed to commence the actions, and made a number of false statements to clients representing that the actions had been commenced. The court suspended the attorney from practice for six months.

In the case of In re Moller, 244 App. Div. 819, 279 N. Y. S. 779, the court did nothing more than censure

the accused attorney after finding that he had "displayed gross carelessness and a reprehensible indifference to his client's interests, as he has to his own in this proceeding before the bar association and the official referee as well as in this court." The court concluded its opinion as follows: "He might, to some extent, relieve himself of the effect of this censure by returning to his client the sum of $55 which, although unearned, he retains."

In Ring v. State Bar of California (Cal. Sup.), 47 P. (2d) 704, the accused attorney had been employed in 1927, and had received advances for costs and fees in the sum of $1,250, of which $153.48 went for costs. In February 1932, another attorney was substituted to close the estate. Very few services were performed by petitioner (accused) beyond the preliminary steps of administration. No inventory and appraisement was ever filed by him. A $100 bond premium was paid yearly by petitioner's client during all of the years that administration was delayed. Petitioner's statutory fee, to which he would have been entitled for probating and closing the estate, was $735. The remainder of the money he claimed as compensation for extraordinary services. He did not appear at the hearing before the local administrative committee or before the board of governors of the state bar. He claimed he had never received notice of the various hearings, though the record showed due service of the original order to show cause. He contended that, by reason of his absence from the various hearings, his defense had never been presented. He was already under suspension for two and one-half years for several previous acts of misconduct. It appeared that for several years petitioner had been gravely ill, and for a large part of the time was confined to the Veterans' hospital. The period of petitioner's prior suspension had not yet expired and would not until the end of January 1936. The supreme court suspended petitioner from practice for one year from the making of the order on August 1, 1935.

In re Disbarment of McCann, 181 Wash. 183, 42 P. (2d) 437, was a case in which the accused attorney was careless and negligent in the handling of the business of certain clients, and also withheld funds belonging to one client for a period of between two or three years without advising client or making any accounting, and paid no part of such funds until after disbarment proceedings were commenced. The board of governors recommended permanent disbarment, but the supreme court suspended the accused attorney from practice for one year.

In the case of In re Breding, 188 Minn. 367, 247 N. W. 694, accused counsel "received for a woman client a check for $490 payable to him and the client jointly, from which he was to have a fee of $75. She called at his office on a Saturday after banking hours and indorsed the check so he could cash it; she agreeing to return on Monday for her $415. She returned on Monday but was unable to obtain the $415 or any portion thereof. Two weeks later she was given $100 and she finally obtained the entire amount due her in small installments paid at the rate of $5, $10, and $15 covering a period of about one year." He also ignored letters and notices from the chairman of the ethics committee of the state bar association, the secretary of the state board of law examiners, and the secretary of the ethics committee of Hennepin County bar association. We quote from the opinion of the court: "Counsel is now 54 years of age. He was admitted to practice in 1906. He has had various connections with other lawyers and, generally speaking, up to about 1923 has maintained a high standing in his profession and up to that time was fairly successful. Some time thereafter misfortune seems to have come upon him and for some reason his practice has largely disappeared. For the last few years he has been greatly depressed and it may be that he has suffered a type of nervous breakdown." After pointing out that the ignoring by a lawyer of important letters from those to whom it is his duty to speak is to be condemned,

the court adjudged that the accused attorney be disbarred, but at the same time ordered that any time after one year he would be permitted to apply for reinstatement, when it would be necessary, amongst other things, to satisfy the court that he would have the stability and strength of manhood to perform his duties as an attorney in the manner that is expected of him by the courts and by the public.

In the case of Matter of Rose, 197 App. Div. 365, 189 N. Y. S. 543, the accused attorney commenced suit for a client to recover damages for injuries sustained. Later the suit was settled out of court for $175. No part of this sum was turned over to the client until disciplinary proceedings had been instituted. During the pendency of such proceedings, he paid $75 to the client, retaining $100 as attorney's fee. In the meantime many demands had been made upon him by the client that he deduct his attorney's fee and remit balance to client. This he had failed to do, having mingled the whole $175 with his own funds and used it for his own purposes. The excuses put forward by the attorney for not remitting to his client sooner were found to be unsatisfactory. He was suspended from practice for six months.

In a comparatively recent Nevada case where the accused attorney had collected money for a client and failed for some two years to pay it over in spite of frequent demands by the client and repeated promises by the accused attorney to make payment, the attorney complained of was suspended from practice for one year. In re Pilkington, 56 Nev. 295, 49 P. (2d) 965.

Earlier in this opinion it has been pointed out that Mr. Miller did not at any time inform Mr. McCann that he was under suspension from practicing law for the period beginning September 18, 1933, and ending March 18, 1934. In this connection attention is directed to the positive testimony of Mr. McCann that on November 5, 1933, he told Mr. Miller that mortgagor's application for a home loan had been denied, and for him to start the suit, to which he replied that he would get right at it

and would call McCann up when he got it through. This conversation is not denied by Mr. Miller, and he thus stands in the position of having promised to do what would have constituted contempt of this court.

This is the third time petitioner has been before this court on charges of unprofessional conduct. In 1933 he was suspended from practice for six months for unprofessional conduct in the handling of certain clients' money. Between one and two years later he was again suspended from practice for the period of six months for delaying the settling up of an estate for nearly twenty years. In recommending disbarment, the board of governors took into consideration the two previous suspensions, as well as "the numerous occasions on which he has been before the local administrative committee, this board and the supreme court for disciplinary action, together with the known and confessed irresponsible method of practicing law, which endangers the general public and those members who may select him as their counsel."

■ We do not decide whether the local administrative committee, the board of governors, and this court are entitled to take into consideration complaints for unprofessional conduct made against an attorney in proceedings wherein he has not been found guilty, but we are clearly of the opinion that the local administrative committee and the board of governors, as well as this court are not only entitled, but in duty bound, to consider an accused attorney's past record as to proceedings wherein disciplinary measures have actually been prescribed. In re Sherin, 50 S. D. 428, 210 N. W. 507; Marsh v. State Bar of California, 2 Cal. (2d) 75, 39 P. (2d) 403; McCue v. State Bar of California (Cal. Sup.), 47 P. (2d) 268; Dalzell v. State Bar of California (Cal. Sup.), 57 P. (2d) 1300.

If petitioner's past record were blameless and we had now to consider only his carelessness and negligence in handling Mr. McCann's business and his conduct in connection with the $25 handed him for clerk's and sheriff's

fees, we would not be disposed to impose a very severe discipline. No corruption or dishonesty is satisfactorily shown, and the local administrative committee twice offered to dismiss all the charges if Mr. Miller would pay back the $25 cost money. But we have the prior suspensions to consider, and petitioner has arrived at an age when he certainly should amend his ways in the matter of practicing law, if he is ever going to amend them. While taking into consideration past suspensions, we do not, on the other hand, forget that there was a time when petitioner, highly gifted as an orator, used his talents unstintingly and without compensation in furthering the patriotic activities of his country. Such recollections make our duty in this proceeding an unpleasant one to perform. Permanent disbarment may well be nothing less than a catastrophe, and as was said by Chief Justice Marshall in Re Burr, 9 Wheat. 529, 530, 6 L. Ed. 152: "The profession of an attorney is of great importance to an individual, and the prosperity of his whole life may depend on its exercise." But the public and the profession must be protected; and while, as Chief Justice Marshall says, the court's discretion "ought to be exercised with great moderation and judgment," we must also remember his words (9 Wheat. 529, loc. cit. 430, 6 L. Ed. 152) that "the respectability of the bar should be maintained."

Notwithstanding petitioner's previous suspensions, we are not clear that the record in the instant proceeding is sufficient upon which to predicate permanent disbarment.

It is the judgment and order of this court that petitioner, A. Grant Miller, be, and he is hereby, suspended from the practice of law in the State of Nevada; that the period of such suspension shall begin August 1, 1936, and shall extend and continue eight months thereafter and until further order of this court.