623 N.W.2d 55 (2001)
2001 SD 29
In the Matter of the Recommendation of the Board of Bar Examiners for the Conditional Admission of John C. OGILVIE, Jr., to the Practice of Law.
No. 21757.
Supreme Court of South Dakota.
Argued November 28, 2000.
Decided March 7, 2001.
John C. Ogilvie, Rapid City, SD, Pro Se applicant.
Mark Steinbeck of Roetzel & Andress, Ft. Meyers, FL, Patrick Duffy, Rapid City, SD, Attorneys for applicant.
*56 Mark Barnett, Attorney General, Craig M. Eichstadt, Deputy Attorney General, Pierre, SD, for Board of Bar Examiners.
AMUNDSON, Justice.
[¶ 1.] John C. Ogilvie Jr. petitioned this Court for admission to practice law in the State of South Dakota. This Court grants Petitioner conditional admission.

FACTS
[¶ 2.] In 1997, Ogilvie graduated from the University of Wyoming School of Law, an ABA accredited law school. That same year, Ogilvie sat for and passed the South Dakota Bar Examination. Prior to admission, however, the Board of Bar Examiners inquired into Ogilvie's past to determine whether he had the requisite level of character and moral fitness to practice law. Areas of concern included two DUI arrests, him being fired for failing a drug test indicating marijuana use, alleged acts of physical abuse of a girlfriend that resulted in the issuance of two temporary restraining orders, and allegations of interference with a divorce proceeding.
[¶ 3.] The Board conducted two hearings in regard to the initial application, on November 18, 1997, and on June 8, 1998, respectively. Although the Board had concerns about these apparent problems, it nevertheless recommended that Ogilvie be admitted to practice law in South Dakota on a conditional basis for three years. This Court, however, did not accept the Board's recommendation and denied Ogilvie's admission.
[¶ 4.] In 1999, Ogilvie reapplied for admission. The Board, without reservation, believed Ogilvie's explanations for the somewhat conflicting and sometimes unfounded allegations charged against him. Based on this third hearing before the Board, where he and others testified on his behalf, the Board unanimously agreed to recommend admission to the South Dakota Bar. Because he was unable to practice law in the interim time period between hearings, Ogilvie requested that his bar admission include supervision by a mentoring attorney for a year. The Board incorporated the suggested mentorship condition into its recommendation to this Court.

DECISION
[¶ 5.] Although we are not bound to accept the Board of Bar Examiners' recommendation, we give it "careful consideration." Petition of Reutter, 500 N.W.2d 900, 902 (S.D.1993); Petition of Draeger, 463 N.W.2d 346, 347 (S.D.1990); Petition of Husby, 426 N.W.2d 27, 28 (S.D. 1988); see also In Re Widdison, 539 N.W.2d 671 (S.D.1995). A second-time applicant must prove good character and moral fitness to the standard of clear and convincing evidence. See SDCL 16-16-2.2; Petition of Trygstad, 435 N.W.2d 723, 724 (S.D.1989), aff'd. on reh'g, 447 N.W.2d 360 (S.D.1989); Petition of Reutter, 500 N.W.2d at 901. "[U]nless we hold denial of [admission] is final and unalterable, a position never taken previously, we must be open to the possibility that [an applicant] can so thoroughly reform that [admission] becomes fair and reasonable." In Re Pier, 1997 SD 23, ¶ 9, 561 N.W.2d 297, 300.
[¶ 6.] Ogilvie showed to the satisfaction of the Board that he had the requisite moral character to practice law in South Dakota. Ogilvie appeared forthright and candid about the concerns of the Board both in person and through documentation. For example, he listed the two DUI convictions, and the two protection orders placed against him by a former girlfriend on his bar application. A drug and alcohol counselor, Ms. JoSee Suess, examined Ogilvie as to his propensity towards substance abuse. Her expert opinion dispelled any concern the Board had of Ogilvie's drinking or drug use. Other witnesses, as well as Ogilvie, testified as to the other incidents of concern and his *57 character.[1] The Board found Ogilvie and the other witnesses to be credible. By the Board's assessment, the perceptions and explanations of the events by these witnesses dispelled the concerns of the Board.
[¶ 7.] Ogilvie, as required by statute,[2] has demonstrated that his "candor in the admission process" has been exemplary; that there was sufficient "evidence of rehabilitation" as offered by Ms. Suess and a Certificate of Completion of a Men's Domestic Violence Education Class offered at Lutheran Social Services; and that the "reliability of the information concerning the conduct" of his other transgressions had been clearly offset by the overwhelming testimony by him and others. It has also been two years since the last time we reviewed this application. It is important to note that there have been no reports of misconduct over that time. Thus "recency of conduct" should also favor Ogilvie under SDCL 16-16-2.4(b) as the incidents of concern occurred primarily in 1992. The Board carefully considered the factors listed in SDCL 16-16-2.4, and found, in part, in the Board's Finding of Fact # 14 that "[t]he Board now has no further lingering doubts as to Mr. Ogilvie's character and fitness to practice law." There is nothing contrary, in the record, to this finding.
[¶ 8.] In response to the dissenters, this Court should focus its attention on the third hearing rather than placing too much emphasis on the first and second hearing. The dissent of board member Jim Leach torpedoed the conditional admission recommended by a majority of the Board following the second hearing. A majority of this Court followed the recommendation of the Leach dissent when originally considered and denied Ogilvie admission. The order of this Court permitted Ogilvie "to reapply at some future time," which Ogilvie did. After a third hearing, in accordance with directions of this Court, the Board unanimously recommended conditional admission. The dissenters embrace a position contrary to the Board and again breathe new life into the Leach dissent by totally disregarding the good and honest efforts put forth by the Board.[3] The Board, which is comprised of well-respected persons in the legal community, made its well-reasoned decision to allow Ogilvie conditional admission to practice law in our state.[4]
*58 [¶ 9.] If we are to allow a denied applicant the chance to come before us at a future date, then we should place greater emphasis on the applicants moral character exhibited from the time of denial. Otherwise by allowing applicant's to reapply at a future date would become no more than an exercise in futility. It is worth repeating that "unless we hold denial of [admission] is final and unalterable, a position never taken previously, we must be open to the possibility that [an applicant] can so thoroughly reform that [admission] becomes fair and reasonable." In Re Pier, supra. The dissenters would rather, despite our permission for this applicant to reapply to come before us, defeat Ogilvie's admission based solely on evidence previously considered. The transcript of the third hearing along with the recommendation by the Board supports our decision today.
[¶ 10.] While the standard of review is de novo, we should give some deference to the Board regarding character and credibility. The Board is in a much better position than this Court as we are limited to the cold record in assessing an applicant's personal traits. See SDCL 1-26-36. There is no question that this applicant is not "squeaky clean." There is also no question that "squeaky-clean" is not the standard. In light of Ogilvie's prior indiscretions, the Board found that Ogilvie had the requisite level of good moral character to practice law. I submit that Ogilvie is deserving of the chance to prove the Board right. There is no doubt Ogilvie's conduct will be viewed as if he was under a microscope throughout this conditional period. After such close diagnostic observation, this Court will again have the opportunity to again consider whether to lift the condition of this admission based on Ogilvie's showing that such lifting is appropriate.
[¶ 11.] We determine that Ogilvie has carried his burden of proving good moral character as required under SDCL 16-16-2.2. As a part of his admission, however, this Court determines that a three-year mentorship period is in the best interests of Ogilvie and the public. Therefore, this Court adopts the principle of mentorship, but also attaches certain obligations of Ogilvie. In implementing the mentorship arrangement, it is Ogilvie's obligation to select a mentor, which must be approved by both the Board of Bar Examiners and this Court. Both Ogilvie and his mentor must report on a quarterly basis to the Board as to Ogilvie's current status in his practice of law for the next three years. Furthermore, Ogilvie will agree to supply any records regarding chemical dependency assessments requested by the Board during the conditional period. It is incumbent upon Ogilvie to comply with every condition set by this Court. Ogilvie's conditional admission is subject to revocation if he fails to adhere to any of these conditions.
[¶ 12.] The Court agrees with the Board's recommendation and Ogilvie is granted admission to practice law in the State of South Dakota with the conditions provided herein.[5]
SABERS, Justice, concurs.
[¶ 14.] KONENKAMP, Justice, concurs with a writing.
[¶ 15.] MILLER, Chief Justice, and GILBERTSON, Justice, dissent.
KONENKAMP, Justice (concurring).

A.
[¶ 16.] Five years ago, we amended our rules for licensing attorneys to permit "conditional" admissions. Before that time, when the character and fitness review *59 of an applicant revealed questionable past conduct, the Board of Bar Examiners had two choices: recommend the applicant's acceptance or rejection. A conditional admission allows another alternative. It offers a probationary period for those not able to gain admission to practice because of misconduct in the past or lingering questions of character in the present. Mr. Ogilvie's case fits within this category. He is not qualified to be admitted outright, there being unresolved questions about his background and character. On the other hand, under our standards his application to practice law cannot be completely denied because these unresolved questions may be answered in his favor once he has had an opportunity to prove himself.
Our rule provides:
If the Board of Bar Examiners determines that there are unresolved issues of good moral character, fitness, or general qualifications of the applicant, the board, in its discretion, may make a recommendation to the Supreme Court of conditional admission. The recommendation may incorporate such terms, conditions, and restrictions and be for such duration as the board determines appropriate. The Supreme Court may accept or reject the recommendation.
The Board of Bar Examiners shall review the conditional admission no later than the date specified in the recommendation and recommend to the Supreme Court that:
(1) The conditional admission be terminated, resulting in loss of license; or
(2) That the conditional admission be modified and/or extended; or
(3) That full admission be granted.
The Supreme Court may accept or reject the recommendation.
A conditional admission shall be confidential except that the Board of Bar Examiners shall advise the secretary-treasurer of the State Bar of such conditional admission, and except as provided in §§ 16-16-15 and 16-19-99. An applicant admitted to the practice of law pursuant to this section is bound by the terms of such conditional admission. Applicants aggrieved by the decision of the Board of Bar Examiners may seek review pursuant to § 16-16-16.
SDCL 16-16-17.1.
[¶ 18.] In deciding whether to conditionally admit an applicant with a dubious past, one question we must ask is how forthright was the applicant in admitting past mistakes and how has the applicant behaved since those mistakes. For these individuals, it is not enough simply to show that they now manage to follow the rules, they must also show that they have so reformed that their past conduct will not be repeated. In assessing an application, we balance the severity of the past misconduct with the applicant's overall record. See SDCL 16-16-2.3, 2.4.
[¶ 19.] Conditional admissions should only be allowed in exceptional cases. Our foremost concern must be the protection of the public and the integrity of the profession. Where questions about an applicant's character and fitness have not been fully resolved, but there is no solid reason to declare the applicant morally unfit to serve as an attorney, a conditional admission may be appropriate. Each case must be judged on its own merits. Whatever rehabilitation is required must occur before any type of admission.
[¶ 20.] Since we adopted the conditional admission process in 1996, the Board of Bar Examiners has recommended and rejected several applicants. On the board's recommendation, we approved three conditional admissions. Two have now successfully completed their probationary terms and one is currently practicing on a conditional license. The board refused to recommend two applicants. These two did not appeal and so their cases never came before us. Finally, not counting Ogilvie's case, the board recommended admission for two other applicants (one a full admission and the other conditional) and we rejected the recommendations.
*60 [¶ 21.] No fault should be ascribed to the board members for carrying out their duties simply because we might disagree with their recommendations. The individuals who serve on the board should be commended for their generous sacrifice of time and earnest public service. It is apparent from reading the record in this case that the board members conscientiously worked to make an impartial decision. We would not be able to perform our function as the final arbiter in deciding the admission of attorneys without their help. Ultimately, though, it remains our obligation to decide on their recommendations.

B.
[¶ 22.] The episode of the note to his girlfriend discouraging her from involvement in a divorce trial has been a troubling focal point in this case. Without tolerating any excuses for this conduct, it still needs to be put in perspective. It was the culmination of a highly dysfunctional relationship between Ogilvie and his girlfriend. Ogilvie had confided to her that sometime in the past he had been romantically involved with a married woman who was separated from her husband. Later, that woman and her husband entered divorce proceedings.
[¶ 23.] Somehow, Ogilvie's girlfriend insinuated herself into that divorce. She told Ogilvie that she was working on the case as a paralegal for the husband, but according to the husband's attorney, she was not. She made it known to the husband's attorney that her boyfriend (Ogilvie) had been involved with his client's wife. Ogilvie was then subpoenaed for the trial. Apparently, the husband's attorney wanted Ogilvie to testify that he had an affair with the wife. If Ogilvie attempted to deny it, his girlfriend would be there to contradict him. Although he appeared for the trial, he was never called to testify. Ogilvie's note was an attempt to discourage his girlfriend from involvement in the case. She did not know either of the parties; her only knowledge came from him. He should not have sent that note, obviously. But Ogilvie's equivocal responses to questions about this note reflect, I believe, the chaotic nature of his relationship with this girlfriend.
[¶ 24.] Ogilvie told his girlfriend that he wished to end their relationship. Unwilling to accept this, she followed him, called him, pursued him, even at high speed on the interstate. Finally, when Ogilvie threatened to get a protection order, she immediately got one herself. Not satisfied with that, she then went to another former girlfriend and told her that Ogilvie was going to kill her. Thus, she was able to talk someone else into obtaining a protection order against him; however, that woman later admitted that the only reason she sought a protection order was because Ogilvie's girlfriend had talked to her. She herself had no personal knowledge of a reason to seek one.
[¶ 25.] The board held three hearings and took considerable testimony on these issues. From my reading of the record, it is certainly not clear that Ogilvie ever harmed his girlfriend. Most of the board members were unconvinced as well. There remains some question whether the injuries the girlfriend said she received from Ogilvie were actually self-inflicted. She obtained a protection order, but she failed to show up for the required hearing, even though it was rescheduled several times for her benefit. I am also satisfied that Ogilvie had no intention to assault or harm the other girlfriend and that now appears to be her belief. If I thought that he had actually harmed either of these women, or threatened to harm them, I would surely consider the case quite differently.

C.
[¶ 26.] There are positive things to say about Ogilvie or we would not be considering him at all. He was honorably discharged after service in the armed forces. He performed well in law school. He has had successful careers in the past. It is *61 also important to note that he took a course in domestic violence, not because he conceded that he had committed any violence, but because he felt it was important to demonstrate his willingness and openness to do whatever is necessary to remove any lingering doubts about his suitability. He agreed to waive confidentiality in this proceeding so that this matter could be heard publicly. Certainly, this is a sign of sincerity, if not courage.
[¶ 27.] Ogilvie's background can more fairly be categorized as evincing poor judgment and lack of maturity, rather than serious moral deficiency reflecting on future professional fitness. It seems that many of his problems occurred at a time when he was abusing chemicals. During his probationary period, the board will have the discretion to require additional chemical dependency assessments whenever it deems it necessary to ensure that he is not impaired in the practice of law. A conditional admission allows the board to maintain close oversight of an attorney. Under probation, the questionable issues concerning this applicant can be watched until he successfully completes his probationary term. If problems occur again, his conditional license can be promptly suspended or revoked.
MILLER, Chief Justice (dissenting).
[¶ 28.] I respectfully dissent because I am convinced that Ogilvie has failed to establish by clear and convincing evidence that he possesses the "good moral character" to gain admission to the State Bar of South Dakota.
In Application of Widdison, 539 N.W.2d 671, 675 (S.D.1995) (citing In re Egan, 52 S.D. 394, 398, 218 N.W. 1, 2-3 (1928)), we set forth the basis upon which an attorney is allowed to enter and remain in this profession. Therein we stated:
"The right to practice law" is not in any proper sense of the word a "right" at all, but rather a matter of license and high privilege. Certainly it is in no sense an absolute right. It is in the nature of a franchise to the enjoyment of which no one is admitted as a matter of right but only upon proof of fitness and qualifications which must be maintained if the privilege is to continue in enjoyment.
[¶ 30.] The issue is whether Ogilvie possesses "good moral character," a mandatory requirement for admission. SDCL 16-16-2. SDCL 16-16-2.1 defines "good moral character" as including, but not limited to, "qualities of honesty, candor, trustworthiness, diligence, reliability, observance of fiduciary and financial responsibility, and respect for the rights of others and for the judicial process." That statute also provides that "any fact reflecting a deficiency of good moral character may constitute a basis for a denial of admission." Widdison, 539 N.W.2d at 678. The burden of establishing good moral character is the responsibility of the applicant and must be made by clear and convincing evidence. SDCL 16-16-2.2. In reviewing this case, per SDCL 16-16-16, we must conduct a de novo review of both questions of law and fact. Widdison, 539 N.W.2d at 675.
[¶ 31.] First, I feel compelled to observe that the Board in this case seems to treat admission to practice law in South Dakota as a RIGHT rather than the PRIVILEGE which it is. In reviewing the hearing transcripts to these proceedings, and the Board's own findings and conclusions, the inescapable conclusion is that the Board felt that simply because he passed our bar examination and since his troubling events are in the past, Ogilvie should be admitted. This approach ignores our holding in Widdison and defeats the safe guard of having a Board of Bar Examiners. Their role is to protect the citizens of South Dakota by preventing unsavory, questionable individuals from wielding the powers flowing from the holding of a license to practice law. Caution should be their guiding principle. In my view, it would be better for them to err on the side of denial, rather than grant admission *62 to an individual who may wreak havoc on our unsuspecting and trusting citizens.
[¶ 32.] As our rules for admission reveal, above all else, an attorney must be forthright and honest. SDCL 16-16-2.1. There is no compromise in this area. I believe Ogilvie failed to show he possesses those requisites. The hearing transcripts are replete with instances of his evasive answers and inconsistent testimony between himself and his witnesses.
[¶ 33.] One significant instance involves the testimony surrounding Colleen Roper's allegation that Ogilvie assaulted her, which conduct resulted in the issuance of a temporary restraining order against him. His bar application disclosed his initial version of the event. In essence, he denied ever striking Roper. At the first hearing, Board Member Leach questioned Ogilvie about pictures showing Roper with a bruised forehead and possibly a bruised right arm she allegedly suffered at Ogilvie's hands. When Leach asked Ogilvie about Roper's injuries and allegations, he responded that he merely had "heard [about them] through the grapevine" from Collette Brown (now Olson), then wife to Ogilvie's friend, Doug Brown. According to Ogilvie, he went to visit the Browns and, when he arrived, Collette told him he was not welcome at their home because he had assaulted Roper. Later, he contends that Collette told him that Roper admitted to her that the injuries were accidentally self-inflicted, stating that following an argument with Ogilvie and in her haste to follow him, she injured herself opening the car door into her forehead (he never explained the bruise on her arm that was apparent on the photograph).
[¶ 34.] At the second hearing, Ogilvie produced other witnesses to support his "grapevine" testimony at the first hearing. First, Melanie Kelley testified that Collette told her that Roper injured herself when jerking her car door open. The inconsistency, and resultant problem for Ogilvie, is that Kelley testified that Collette told her Roper hit herself in the eye, not the forehead. Then Doug Brown, ex-husband of Collette, testified that Collette told him the car door incident occurred at some Interstate 90 ramp. The most unfavorable testimony for Ogilvie is that, at the same hearing, Collette testified that Roper never told her such a story and, furthermore, she had never told Ogilvie, Kelley or Doug any such story. Ogilvie's three witnesses all tell inconsistent stories and all are inconsistent with his own story. His explanation that Collette "just doesn't remember" insults the common sense of this Court and falls far below his burden to prove his good moral character by clear and convincing evidence. See Widdison, 539 N.W.2d at 678-79.
[¶ 35.] Another instance involves testimony concerning Ogilvie's and Roper's involvement in the circuit court divorce proceeding of Terrill v. Terrill.[6] Board Member Leach asked Ogilvie if he had ever attempted to dissuade Roper from testifying in that case. Ogilvie responded that he had not. Leach then produced a handwritten note from Ogilvie addressed to Roper, which reads in pertinent part as follows:
Colleen, guess what? Your mom called to say Dave Claggett called for you on business and will try again at your mom's. I told you this would happen. If you speak to him, I don't think you and I should speak again before that trial is over. Please move out of my house and go home to Farmington [New Mexico]. I hope to see you after the 9th but I hope to God I don't see you in the hall in Deadwood on the 9th. I will speak to you before you speak to Claggett if you like. I will be happy to speak to you on the phone in Farmington at any time, but I know you and I don't think you will avoid him as I asked.

*63 Therefore, please leave my house key on the table. If you forget anything, I will bring it when I come down to New Mexico. If you involve yourself anymore in Terrill v. Terrill, no matter how inadvertently, then I will mail it to you because the rift between us will be too large to overcome. Believe it or not, this was not an easy note for me to write and I did not write it in anger. I hope things work out for us but I just don't know anymore. Love, Jack.
[¶ 36.] This note reveals that Ogilvie's earlier answer regarding dissuading her was not honest. It clearly shows he DID try to dissuade Roper from testifying in Terrill v. Terrill.
[¶ 37.] Leach then gave Ogilvie the opportunity to change his earlier, untruthful answer, but he refused. Rather, he chose to attempt to explain the note by testifying that it concerned Roper's paralegal work on the case for attorney, Dave Claggett, not her testimony in the case. His explanation, if believed, requires us to: (1) ignore the plain language of his own personal note; (2) reject attorney Claggett's later testimony that Roper did not work for him as a paralegal on the Terrill matter; and (3) believe Ogilvie's unconvincing response to attorney Claggett's testimony in which Ogilvie explains that Roper left everyday for what he assumed to be work for Claggett. After Claggett's testimony, Ogilvie asked the Board to believe that his first paralegal story came from representations to him by Roper; however, that simply cannot be reconciled with all of the other evidence that was presented.
[¶ 38.] Ogilvie seems to have a new answer for everything. As was the situation regarding the issue of Roper's injuries, for each new unfavorable fact that appears, he has a new and different explanation.
[¶ 39.] Furthermore, the sentiment expressed about his relationship with Roper in the note is inconsistent with his testimony to the Board. He told them that Roper was mentally unstable, he expected her to be leaving for New Mexico soon, he hoped she would find another boyfriend and he wanted to be away from her and finished with the relationship. His note, however, reveals a much different story. Therein, he expresses anguish over potentially losing her, mentions going to see her in New Mexico and promises to return anything of hers she forgets. His story to the Board is a complete turnaround from his sentiment in the note. Both stories cannot be true. This seems to be the pattern in all of his testimony.
[¶ 40.] In further connection with questioning involving his relation to the Terrill v. Terrill case, Ogilvie played coy with the Board and gave evasive answers when asked why he would be in Deadwood on June 9th. Ogilvie testified at the first hearing in the following manner:
Q. [Board Member Leach] What was going to take you to Deadwood on the 9th, then?
A. A subpoena. I don't know that I even had the subpoena at that time, but I was subpoenaed to appear on the 9th or sometime in Deadwood at the Terrill v. Terrill trial.
Q. Who subpoenaed you?
A. Dave Claggett.
Q. Why were you subpoenaed?
A. I don't know. I sat in the hall.
Q. You have no idea why you were subpoenaed in that case?
A. I would have to assume. Would you like me to assume?
Q. Well, yeah, go ahead and tell us what you assumed.
A. I would have to think that I was going to be a rebuttal witness if needed and therefore, I sat in the hall and I was not needed so then I went home.
Q. To rebut what?
A. I would have to assume to rebut that I had been in a relationship with Sharon Terrill.
Q. Where would that allegation have come from?

*64 A. Because I had been in a relationship with Sharon Terrill.
Q. You did have an interest in Terrill v. Terrill?

A. No, that relationship had been over for two years.
Q. You had a relationship with Mrs. Terrill, a sexual relationship, correct?
A. That's correct
Q. While she was married to Mr. Terrill?
A. That's correct, but I did not know that.
Q. And now Mr. and Mrs. Terrill were getting divorced?
A. That's correct.
Q. And you were subpoenaed up as a witness in their divorce trial?
A. That's right. I think it was a custody trial.
Q. Now, at that point, Mr. Ogilvie, you had a pretty good idea why you were being subpoenaed, didn't you?
A. Yes, just what I just told you, but I could only guess because I wasn't told exactly why I was being subpoenaed.
[¶ 41.] First, Ogilvie's testimony lacks the honesty and candor required under SDCL 16-16-2.1. Second, how did Ogilvie intend to rebut the assertion that he had an affair with Sharon Terrill if it was in fact true, as he now admits? Did he intend to perjure himself? The purpose of the proceedings before the Board was to ascertain if he had the requisite good moral character to practice law in South Dakota. His evasive answers and coy attitude toward the questioner exhibit an unwillingness to come forward with the complete truth. Permitting such an individual to practice law will diminish the integrity and trustworthiness of the South Dakota Bar, lowering public confidence in our profession.
[¶ 42.] Another instance related to the Terrill matter that demonstrates Ogilvie's lack of candor relates to his testimony regarding the propriety of attempting to persuade Roper not to testify in the Terrill matter. He was asked: "Do you think it was appropriate for you to tell a potential witness in a trial to, quote, go home to Farmington, New Mexico, closed quote?" Ogilvie responded "[a]t the time I thought it was fine." The most distressing and disturbing fact about this testimony is Ogilvie's status "at the time." He was thirty-nine years old, had taken one year of paralegal studies at National College, had completed a legal ethics class and received the second highest grade, had worked as a paralegal and he knew Roper had been subpoenaed (although he testified otherwise, his personal note discredits his testimony). Yet, he thought it was "fine" to suggest a subpoenaed witness leave the state. This unethical, truth-suppressing conduct is not deserving of the privilege to practice law in South Dakota.
[¶ 43.] The Board has twice recommended Ogilvie for conditional admission. It would seem that they are willing to ignore their better judgment. After the second hearing, despite having several concerns whether he had met his burden of proving good moral character, the Board recommended Ogilvie for conditional admission. My question is why? The Board Chair, after announcing they would recommend Ogilvie for conditional admission, stated her concerns on the record as follows "[w]e are concerned with what we believe are several inconsistencies in the record and your history with the DWIs. The conditional admission is not a public situation. The public does not know you have been conditionally admitted."
[¶ 44.] If the Board has such grave concerns, which go right to the heart of the determination they are appointed to make, why are they recommending admission? This is especially true if the concerns are legally kept from the public, his potential clients.
[¶ 45.] Furthermore, another Board Member felt compelled to express his additional, specific reservations on the record. He was concerned with inconsistent statements *65 about Ogilvie's drug and alcohol report as compared to his bar application. He was also concerned with the personal note from Ogilvie to Roper attempting to dissuade her from testifying in the Terrill matter and Ogilvie's unconvincing explanation. Despite these concerns, this Board member voted for conditional admission. I cannot understand why. Under SDCL 16-16-2.1 "[a] fact reflecting a deficiency of good moral character may constitute a basis for denial of admission."
[¶ 46.] It could certainly be argued that the Board would prefer to pass the buck to this Court. That argument finds a great deal of support in the Board's own findings and conclusions of September 9, 1998, following the second hearing. Finding 7 specifically articulates "concerns that arise from the Colleen Roper episode;" in Finding 9 they explain why they find that Ogilvie's explanations "are not entirely satisfactory;" in Finding 10 they identify several issues in which "[c]ertain other doubts are also apparent on this record;" in Finding 14 they reiterate that they have "lingering doubts."
[¶ 47.] Then the Board entered Conclusions of Law, which among other things held that "The Board has some doubt as to whether the Applicant has carried his burden regarding good moral character" (Conclusion 3) and that "there are unresolved issues of good moral character" (Conclusion 4). Despite all of these factual and legal concerns and doubts regarding Ogilvie's good moral character, the Board recommended to this Court that he be conditionally admitted to the Bar. Clearly, other than Member Leach, who filed a detailed and persuasive dissent, it would appear the Board disregarded its own articulated concerns and ignored its better judgment.
[¶ 48.] After a third hearing, the Board once again has recommended conditional admission. Unfortunately, that hearing began with what I believe was an offensive and inappropriate motion seeking to disqualify Board Member Leach, the only member who had dissented from the earlier decision. Therein, Ogilvie's counsel (his brother-in-law and an Assistant United States Attorney in Florida) suggested that Leach's dissent affected other Board members and the members of this Court when we refused to accept the recommendation of conditional admission. The third hearing also was clearly orchestrated and is replete with lengthy, reasoned answers to softball questions and testimony regarding a high speed, interstate highway car chase (Ogilvie had consistently "forgotten" to mention this dramatic scene in either of the two prior hearings)! Then, knowing what the Board's earlier concerns were, Ogilvie and his counsel served up tasty, palatable answers for each concern right down the line. It is no wonder Ogilvie gives all the right answers in his third hearing; it is the third time he has had to recount the questionable circumstances in his life. He ought to have his life story down by that point and know exactly what the Board or this Court wants to hear. Furthermore, with his counsel, Steinbeck, doing the direct questioning, and there being no cross-examination, how could the Board not recommend him for admission after recommending him the first time with their specific and articulated serious concerns? Of course, they heard Ogilvie's cleansed and unchallenged story, entered findings of fact and conclusions specifically eliminating their earlier concerns and again recommended a conditional admission (of course, by then Leach recused himself, and we do not have the benefit of his thoughts on the decision).
[¶ 49.] I am very troubled by the motion to disqualify Leach. Although I can certainly understand why he wanted Leach off the case, his counsel's reasoning is nothing short of an insult to the integrity of Leach, the Board and the members of this Court. It was a not too subtle attempt to silence any opposition to his case. He contends that permitting Leach to participate prejudices Ogilvie by potentially poisoning our decision once again. In reality, *66 he sought (and ultimately was successful) to remove the one Board member who was fully and actively discharging his duties to determine if Ogilvie possessed good moral character. It is clear that the truth Leach pried out of Ogilvie in the first two hearings mortified his legal team, and they wanted to do anything they could to assure he would not be a factor in the third hearing.
[¶ 50.] Finally, I am compelled to address Patrick Duffy's scolding and inappropriate closing remarks to the Board at the second hearing. He begins by claiming the hearing was not fair because he did not get notice of certain issues that were raised. His argument lacks merit and undermines his credibility. First, this was the second hearing. No new issues were raised beyond the concerns expressed at the first hearing. Second, under the Board's rules of practice, Ogilvie had an earlier informal meeting with two Board members before the first hearing at which he was made aware of the Board's concerns. Duffy's argument that Ogilvie had no notice is incredible under the facts of this case. He and Ogilvie had ample notice and time to prepare to respond to the issues raised at the second hearing.
[¶ 51.] Then, after complaining that the second hearing was not fair, Duffy proceeded to berate the Board for its treatment of Ogilvie. Duffy should have been reminded that his client was there because his past conduct exhibited need for further evaluation. It is important to note that although the concerns in Ogilvie's past may be from eight years ago, it was not part of his exuberant youth. He was in his mid-thirties when he made many of the decisions that led to the Board questioning whether he possesses good moral character. More importantly, his recent lack of candor and dishonesty at the hearings only increases my conviction that he does not presently possess good moral character.
[¶ 52.] SDCL 16-16-2.3 lists conduct which is cause for further inquiry into an applicant's good moral character. The list is as follows:
(a) Unlawful conduct, including cases in which the record of arrest or conviction was expunged, with the exception of juvenile arrests and dispositions unless they pertain to a serious felony;
(b) Academic misconduct;
(c) Making of false statements, including omissions;
(d) Misconduct in employment;
(e) Acts involving dishonesty, disloyalty, fraud, deceit or misrepresentation;
(f) Abuse of legal process, including the filing of vexatious lawsuits;
(g) Neglect of financial responsibilities;
(h) Neglect of professional obligations;
(i) Violation of an order of a court, including child support orders;
(j) Evidence of mental or emotional instability;
(k) Evidence of drug or alcohol dependency or abuse;
(l) Denial of admission to the bar in another jurisdiction on character and fitness grounds;
(m) Disciplinary action against an applicant in any jurisdiction;
(n) Practicing law while not being so licensed.
The foregoing list is representative, not exclusive.
SDCL 16-16-2.4 guides the Board's consideration of the questionable conduct listed above. It reads:
(1) In reviewing the relevant conduct identified in § 16-16-2.3 the board shall consider:
(a) Applicant's age at the time of the conduct;
(b) Recency of conduct;
(c) Reliability of the information concerning the conduct;
(d) Seriousness of the conduct;
(e) Factors underlying the conduct;
(f) Cumulative effect of conduct or information;

*67 (g) Evidence of rehabilitation; and
(h) Applicant's candor in the admission process.
Duffy argued at length that the Board needed to just admit Ogilvie so he could repay his law school debts. The debt an applicant incurs attending law school is not a factor for the Board to consider. It has nothing to do with whether an applicant possesses good moral character. I say Ogilvie should have anticipated that he would not be a "shoe in" for the South Dakota Bar because, as an adult, he engaged in conduct that draws his good moral character into question. Duffy argues that we need people in the Bar with "a little bit of a taste of life." I would agree, but we only let them in the South Dakota Bar if they are candid about their "taste of life." Ogilvie has failed that test.
[¶ 53.] Although each case must be decided on its own merits, a review of Widdison provides us with significant legal guidance. Therein we held the burden of proving good moral character by clear and convincing evidence remains upon the applicant and that justifications of "I don't know" and "I don't remember" along with other examples cited earlier herein, fail to meet that burden. Further, unwarranted attacks on the impartiality of the Board and arguments that Ogilvie is no worse than others who have been earlier admitted to practice totally lack merit. Widdison, 539 N.W.2d at 678 n. 9 (citing Discipline of Jeffries, 500 N.W.2d 220, 227 (S.D. 1993)) (Henderson J., dissenting.)
[¶ 54.] I assert that Ogilvie has failed, miserably, to prove by clear and convincing evidence that he possesses the good moral character required to practice law in South Dakota. Although concerned, I clearly would not base this view upon his prior problems with alcohol and drugs; he has made an adequate explanation and there is an adequate basis to conclude they will not re-occur. I am concerned and am basing this dissent on his current conduct, which I assert shows a lack of truth and candor, both of which are essential qualities of an attorney.
GILBERTSON, Justice (dissenting).
[¶ 55.] Based on a de novo review of this record, I would hold that Ogilvie has failed by clear and convincing evidence to establish that he possesses the "good moral character" to gain admission to the State Bar of South Dakota. As such, I respectfully dissent from the opinion of the Court.
[¶ 56.] An essential beginning of an examination of this question is to once again re-affirm the basis upon which an attorney is allowed to enter and remain in this professional calling. For nearly as long as there has been a South Dakota, those wishing to engage here in the practice of law have taken the attorney's oath. It states in part:
I will maintain the respect due to courts of justice and judicial officers; ...
I will employ for the purpose of maintaining the causes confided to me such means only as are consistent with truth and honor, and will never seek to mislead the judge or jury by any artifice or false statement of fact or law; ...
SDCL 16-16-18.[7] Note that this is a continual and on-going obligation. Each day of an attorney's life demands that these requirements be met anew. "We recognize the present case involves a question of admission to the bar rather than attorney discipline, however, the same rationale applies here with equal justification." Application of Widdison, 539 N.W.2d 671, 679 (S.D.1995).
*68 [¶ 57.] After three hearings before the Board of Bar Examiners and an oral argument before this Court, to me, the issue comes down to whether Ogilvie possesses "good moral character," a mandatory requirement for admission. SDCL 16-16-2. In so determining, we conduct a de novo review of both questions of law and fact. SDCL 16-16-16. See also Widdison, 539 N.W.2d at 675. SDCL 16-16-2.1 defines "good moral character" as including, but not limited to, "qualities of honesty, candor, trustworthiness, diligence, reliability, observance of fiduciary and financial responsibility, and respect for the rights of others and for the judicial process. Any fact reflecting a deficiency of good moral character may constitute a basis for a denial of admission." Id. (emphasis added). The establishment of good moral character falls squarely upon the applicant and must be made by clear and convincing evidence. SDCL 16-16-2.2.
[¶ 58.] Ogilvie has presented sufficient explanation and evidence concerning his prior problems with alcohol and drugs that there is a basis to conclude they will not re-occur. This leaves remaining the matter of his conduct concerning the allegations by a Ms. Roper of threats against her by Ogilvie if she testified in a legal proceeding and of physical abuse in a domestic relations setting. During that period of time, Roper and Ogilvie were dating and at times sharing the same residence.
[¶ 59.] At the first hearing, Ogilvie initially denied twice that he ever tried to dissuade Roper from testifying. However, Board Member Leach subsequently confronted him with a letter in his own handwriting that contradicted that denial. Ogilvie wrote that letter to Roper strongly discouraging her from testifying.[8] The reason for Ogilvie's potential involvement in the case was the allegation that Ogilvie had had an affair with one of the parties to the divorce.
[¶ 60.] After being confronted with his own letter, Ogilvie subsequently offered the explanation that the sole purpose of the letter was to inform Roper of the end of their relationship because "she was working for Mr. Claggett as a paralegal working exclusively on the Terrill v. Terrill case." However, later in the hearing Claggett testified that, to the best of his recollection, Roper was never working for him as a full-time para-legal.
[¶ 61.] Initially, Ogilvie also denied he ever struck Roper. Subsequently at the hearing, a picture of Roper was produced by Board Member Leach showing what appear to be bruises. Roper had also sought a protection order against Ogilvie identifying him as the source of the injuries. Ogilvie then testified he had no idea how the injuries happened. However, Ogilvie also later responded with an explanation that he was advised by others that Roper had actually received the injuries by *69 striking herself in the head with a car door. He continued to have no idea how the bruise on the arm was caused.
[¶ 62.] To resolve unanswered questions about these incidents, the Board of Bar Examiners granted Ogilvie a second evidentiary hearing to clear up the matter. Ogilvie used the opportunity in large part to attack the mental stability and character of Roper.
[¶ 63.] At the close of the second hearing, counsel for Ogilvie attempted to shift the focus away from his client's burden of proof by a blizzard of other tactics. He outright attacked the impartiality of the Board by declaring, "I don't think these proceedings have been fair and I'll stop right there ... I've not experienced anything like this with a board before ... I can't quite figure out why my client seems to be in the crosshairs." He declared his client to be a "victim" of Roper as "Mike Tyson's genetic equal running around out there with long blond hair ..." He attempted to shift the burden of proof to the Board, "[t]he letters with Judge Tice, I mean what's that show? ... I mean, really you didn't bring Merton in here to even testify." He adopted the "best of the worst" rationale arguing that Ogilvie possessed the requisite good moral character because worse had been admitted to the South Dakota Bar: "I know the kind of people that have gotten in ... I know the records of some of the folks that have passed muster here."
[¶ 64.] Thereafter, the majority of the Board voted to conditionally admit Ogilvie. However, there was a strongly worded dissent by Board Member Leach. This Court, exercising de novo review, subsequently denied Ogilvie admission on October 29, 1998 "without prejudice to reapply at some future time with a more substantial showing."
[¶ 65.] Ogilvie exercised this right and was granted a third hearing before the Board on February 11, 2000. The attempts to silence opposition continued when, at the outset of the hearing, Ogilvie demanded Board Member Leach disqualify himself.[9] Leach was accused of lack of impartiality with specific example being cited that he authored the dissent against Ogilvie's admission to the Bar:[10] "It's also clear in his dissent that was written that steps beyond an objective and fair member of the board." I find these accusations against Board Member Leach to be without any merit. His conduct was entirely proper throughout the proceedings.
[¶ 66.] In the third hearing, Ogilvie brought forth witnesses, some with impressive credentials, to attest to his good moral character. However, most were not in frequent contact with him at the time of the Roper incidents.
[¶ 67.] When confronted by Board Member Leach with the various inconsistencies in his responses throughout the three hearings, Ogilvie now fell back on the position that he had a faulty memory: "I never did know how she sustained the injuries."
[¶ 68.] After the third hearing, the Board, now absent Board Member Leach, again voted to conditionally admit Ogilvie. While we are to carefully consider the Board's recommendations, as previously noted, our factual and legal review are both de novo. Widdison, 539 N.W.2d at 675.
[¶ 69.] There followed oral argument before this Court. SDCL 16-16-2.4 mandates *70 consideration of an "[a]pplicant's candor in the admission process" and "[e]vidence of rehabilitation." In my opinion, neither counsel for Ogilvie nor Ogilvie himself, when he personally addressed this Court, adequately put to rest in his favor, this issue of candor and veracity.
[¶ 70.] Widdison is legally controlling and factually helpful. Therein we made it very clear that an applicant for admission to the South Dakota Bar may not rely upon a selective memory or an empty one as clear and convincing evidence of sufficient good moral character to gain that admission.[11] Further, unwarranted attacks on the impartiality of the Board as a whole, Board Member Leach individually, and arguments that Ogilvie is no worse than the supposed bottom of the barrel that have been admitted, all fail to pass muster. Widdison, 539 N.W.2d at 678 n. 15 (citing Discipline of Jeffries, 500 N.W.2d 220, 227 (S.D.1993) (Henderson J., dissenting) (rejecting a "blaming others mentality" as a basis to establish applicant's purported good moral character)). See also In re Discipline of Dorothy, 2000 SD 23, ¶ 41-42, 605 N.W.2d 493, 505 (imposing discipline on an attorney for refusing to acknowledge his misconduct but "[i]nstead he has proceeded to blame numerous other individuals as the cause of this situation.").[12]
[¶ 71.] Ogilvie argues that his long legal road of law school and multiple admission proceedings, together with the corresponding mental stress and financial cost, should allow him entrance into the Bar. This Court long ago rejected such a theory as a substitute for good moral character.
Many urge that the punishment he has suffered will deter him from future wrongdoing, forgetting that it is not fear as to the consequences of wrongdoing that qualifies one for admission to the bar, but rather an innate desire and intent to follow the right course.
In re Hosford, 62 S.D. 374, 389, 252 N.W. 843, 850 (1934) (citing In re Morrison, 45 S.D. 123, 186 N.W. 556, 559 (1922)). In rejecting Widdison's application we concluded:
The failure to act in accordance with the rules is compounded by the failure to accept responsibility for these acts. The violations here are of the most serious nature as they go to the heart of the judicial systemthe matter of personal legal ethics and trust.
539 N.W.2d at 679 (citations omitted). Moreover, a review of the attorney's oath shows that it is in the first person and in absolutes ("I will" or "I will never."). SDCL 16-16-18.
[¶ 72.] This is not to say that membership in the bar is limited to those with completely unblemished records approaching sainthood. Those who have successfully faced their personal demons, be they drugs, alcohol, gambling or others and *71-77 have overcome them, are not necessarily branded for life because of ancient acts. History is replete with those who have overcome a weakness or character flaw and risen to what Attorney at Law Abraham Lincoln declared to be the "better angels of our nature." Perfection is not required-good moral character is.
[¶ 73.] To gain admission to the bar, an applicant does not have to fit into any preconceived stereotype. Membership in the Bar should be diverse as is the public it is charged with serving. However, for the legal system to properly function, certain common denominators are mandatory. One of these is that members and applicants for membership, exhibit good moral character. In South Dakota a three piece suit and leather briefcase is not a prerequisite to be a lawyergood moral character is.
[¶ 74.] For the protection of the public and its servant, the legal profession, I see no reason to depart from, or lower these standards. Applying them, I conclude that Ogilvie has failed by clear and convincing evidence to establish that he possesses the requisite good moral character for admission to the South Dakota Bar. For the foregoing reasons, I respectfully dissent.
NOTES
[1] As character witnesses, Margaret Steinbeck, a sister and circuit court judge in the state of Florida, and Tim Ogilvie, a brother and president of a technology company, testified on John Ogilvie's behalf.
[2] Under SDCL 16-16-2.4, in reviewing the relevant conduct identified in § 16-16-2.3 the Board shall consider:

(a) Applicant's age at the time of the conduct;
(b) Recency of conduct;
(c) Reliability of the information concerning the conduct;
(d) Seriousness of the conduct;
(e) Factors underlying the conduct;
(f) Cumulative effect of conduct or information;
(g) Evidence of rehabilitation; and
(h) Applicant's candor in the admission process.
[3] The dissenters fail to recognize that Jim Leach recused himself from participating in the third hearing and final decision. The dissenters cannot claim that Leach would have voted the same way as he did previously. Speculation and conjecture by this Court should not substitute for the actual findings made by those who participated at the hearing. The dissenters aim their frustration at the Board, Ogilvie and Ogilvie's counsel for their respective conduct at the third hearing. For example, the dissenters widely criticize Ogilvie's counsel for attempting to have Leach removed from participation in the third hearing. It is noteworthy that Leach himself agreed with Ogilvie's counsel that he would have also attempted to have someone like himself disqualified and found counsel's actions reasonable and within the realm of proper decorum. For the dissenters to portray Oglivie's counsel as disingenuous demeans the elementary purpose of retaining counselto protect the rights and interests of the client. While this Court is not exalting the virtuosity of the procedures taken by Ogilvie's counsel, we are not about to admonish them either.
[4] It is also important to point out that this Court appoints members to the Board of Bar Examiners. See SDCL 16-16-3. To discredit the Board's hard work, as the dissenters have done, makes it a wonder why one appoints a Board to conduct hearings of this nature.
[5] By order of this Court, dated October 16, 2000, Mr. Ogilvie, the Board of Bar Examiners and the State Bar were permitted to submit briefs for our consideration. The State Bar declined to participate by not submitting a brief on its behalf.
[6] Ogilvie, who had had an affair with Mrs. Terrill, had been subpoenaed as a witness. Roper was also a prospective witness, but the purpose of her testimony is not clear from this record.
[7] See also SDCL 16-18-19. It states:

It is the duty of an attorney and counselor at law to employ, for the purpose of maintaining the causes confided to him, such means only as are consistent with truth, and never to seek to mislead the judges by any artifice or false statement of fact or law.
SDCL 16-16-18 and 16-18-19 are not mere platitudes. They are statutory requirements for attorneys which carry disciplinary sanctions. In re Aaberg, 66 S.D. 613, 287 N.W. 506 (1939); In re Hosford, 62 S.D. 374, 252 N.W. 843 (1934).
[8] The letter stated:

Colleen [Roper], guess what? Your mom called to say Dave Claggett called for you on business and will try again at your mom's. I told you this would happen. If you speak to him, I don't think you and I should speak again before that trial is over. Please move out of my house and go home to Farmington. I hope to see you after the 9th but I hope to God I don't see you in the hall in Deadwood on the 9th. I will speak to you before you talk to Claggett if you like. I will be happy to speak to you on the phone in Farmington at any time, but I know you and I don't think you will avoid him as I asked. Therefore, please leave my house key on the table. If you forget anything, I will bring it when I come down to NM. If you involve yourself anymore in Terrill v. Terrill, no matter how inadvertently, then I will mail it to you because the rift between us will be too large to overcome. Believe it or not, this was not an easy note for me to write and I did not write it in anger. I hope things work out for us but I just don't know anymore. Love Jack.
The reference to Claggett is to the attorney who represented Mr. Terrill. Claggett testified that he had learned that Roper "may have some information regarding an individual by the name of Jack Ogilvie that we understood had had an affair or is having relations with [Mrs.] Terrill." Claggett also testified he made contact with Roper as [Mrs. Terrill] "was Jack's girlfriend."
[9] For reasons not set forth in the record, various counsel for the Board throughout the three hearings sat essentially mute. Questioning was done either by counsel for Ogilvie or individual members of the Board. If the motion to disqualify Leach was successful, this would have removed the sole voice that had not previously accepted Ogilvie's arguments and had challenged his position.
[10] The Board held it did not have authority to disqualify Leach as he had been appointed by the Supreme Court and thus could only be removed by it. I think this view is correct. Board Member Leach did participate in the third hearing but apparently chose to disqualify himself from further participation at the time the Board again recommended admission.
[11] In Widdison we held:

[W]hen given the opportunity by the Board to explain how his answers and D.S.'s answers were so similar, Widdison could not. SDCL 16-16-6.2 places the burden of proof by clear and convincing evidence upon Widdison. We agree with the Board's determination that he failed to provide any satisfactory explanation as to the similarities in the examination answers.
539 N.W.2d at 675.
[12] This Court also gives weight to the manner in which this unjustified criticism is leveled: The Board found the complaints by Dorothy against the judges and judicial system to be unsupported by the record, beyond reasoned disagreement of an interpretation of fact or law and an ethical violation. We agree. This clearly was not an isolated incident where emotions of the moment in the heat of litigation overcame better judgment. In re Snyder, 472 U.S. 634, 647, 105 S.Ct. 2874, 2882, 86 L.Ed.2d 504, 514 (1985). The worst of it was prepared or written out in advance with sufficient time to reflect on the inflammatory contents of the statements before they were delivered. In addition, Dorothy could not let it be. These repeated unprofessional attacks continued up to the final close of this appeal record.

Dorothy, 2000 SD 23, ¶ 47, 605 N.W.2d at 507.